## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| AMERINOX PROCESSING, INC., | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Case No. 22-1118 |
| | : | |
| NATIONAL LABOR RELATIONS | : | Cross-Application for Enforcement, |
| BOARD, | : | docketed at No. 22-1158 |
| | : | |
| Respondent. | : | |

## PETITIONER/CROSS-RESPONDENT AMERINOX PROCESSING, INC.'S SUBMISSION OF UNDERLYING DECISION FROM WHICH ITS PETITION ARISES

Pursuant to this Court's Order dated June 24, 2022, Petitioner/Cross-Respondent Amerinox Processing, Inc. ("Amerinox") hereby submits the underlying decision from which its petition for review arises. Specifically, Amerinox  petitions for review the Decision and Order issued by the Respondent, National Labor Relations Board, in NLRB Case Nos. 04-CA-268380, 04-CA-268386, 04-CA-268398, 04-CA-272035, and 04-CA-274177, which was entered on June 3, 2022, amended on July 1, 2022, and published at 371 NLRB No. 105, and requests that said Decision and Order be set aside, modified, and/or remanded for further proceedings. The National Labor Relations Board's June 3, 2022 Decision and Order, as amended, is attached hereto as Exhibit A.

Respectfully submitted,

COZEN O'CONNOR, a Pennsylvania
Professional Corporation

DATED: July 25, 2022                    */s/ Daniel V. Johns*
                                         Daniel V. Johns
                                         Kelly T. Kindig
                                         Joseph A. Scopelitis
                                         DJohns@cozen.com
                                         KKindig@cozen.com
                                         JScopelitis@cozen.com
                                         One Liberty Place
                                         1650 Market Street, Suite 2800
                                         Philadelphia, PA 19103
                                         (215) 665-2000

                                         *Attorneys for Petitioner*

LEGAL\58503159\1

# EXHIBIT A

NOTICE: *This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Amerinox Processing, Inc. *and* International Association of Sheet Metal, Air, Rail & Transportation Workers, Sheet Metal Workers Local 19.** Cases 04–CA–268380, 04–CA–268386, 04–CA–268398, 04–CA–272035, and 04–CA–274177

June 3, 2022

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS KAPLAN AND PROUTY

On July 8, 2021, Administrative Law Judge Andrew S. Gollin issued the attached decision. The Respondent filed exceptions[1] and a supporting brief, the General Counsel and the Charging Party filed answering briefs, and the Respondent filed a combined reply brief to the answering briefs. The General Counsel and the Charging Party also filed cross-exceptions and supporting briefs,[2] the Respondent filed a combined answering brief, and the General Counsel filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision[3] and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[4] and conclusions and to adopt the recommended Order as modified and set forth in full below.[5]

---

[1] The Respondent has requested oral argument. The request is denied as the record, exceptions, and briefs adequately present the issues and the positions of the parties.

[2] The Charging Party filed a combined answering brief and brief in support of its cross-exception.

[3] After the issuance of the judge's decision, the United States District Court for the District of New Jersey granted the Board's petition for injunctive relief filed pursuant to Sec. 10(j) of the Act. *Goonan v. Amerinox Processing, Inc.,* No. 1:21-cv-11773, 2021 WL 2948052 (D.N.J. July 14, 2021).

[4] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products,* 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

In affirming the judge's finding that the Respondent violated Sec. 8(a)(3) and (1) by immediately separating its employee Kyle George, rather than allowing him to work his final two weeks, we do not rely on the judge's finding that the timing of George's removal in connection to when he distributed union authorization cards demonstrates knowledge. See *Register Guard,* 344 NLRB 1142, 1145 (2005) (declining to infer knowledge solely on the basis of timing). Member Prouty finds it unnecessary to pass on whether the timing of an adverse employment action, on its own, may establish knowledge of an employees' protected activity in certain circumstances because, as discussed in the judge's decision, other evidence, in addition to timing, supports the judge's finding that the Respondent had knowledge of George's union activity. Further, as set forth in the judge's recommended remedy, we shall order the Respondent to make George whole, with interest, for any loss of earnings and other benefits that he would have earned during the two-week period prior to the time his resignation would have been effective.

In setting out the facts, the judge inadvertently stated that "[Andrew] Rodriguez also saw employee Christian Albino show Matthew Mintz the text he received from the Union." In fact, Miguel Gonzalez witnessed this interaction between Albino and Mintz. This inadvertent error has not affected our disposition of this case.

Member Kaplan agrees with the judge and his colleagues that the Respondent violated Sec. 8(a)(3) and (1) by immediately separating George, rather than allowing him to work his final two weeks, discharging its employee Miguel Gonzalez, and laying off its employees Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable. In so doing, Member Kaplan finds that the General Counsel met her burden of showing the Respondent's animus under *Tschiggfrie Properties, Ltd.,* 368 NLRB No. 120 (2019).

In adopting the judge's finding that the Respondent violated Sec. 8(a)(1) by maintaining work rules that prohibit employees from disclosing information about wages, benefits, and other terms and conditions of employment, Member Kaplan expresses no opinion with respect to whether the requirements set forth in *Passavant Memorial Area Hospital,* 237 NLRB 138, 138 (1978), represent a proper standard for effective repudiation of unlawful conduct, but he agrees that the Respondent's actions did not satisfy the *Passavant* standard in this case.

[5] We have amended the judge's conclusions of law consistent with our findings herein. We have also amended the remedy and modified the judge's recommended Order consistent with our legal conclusions herein, to conform to the Board's standard remedial language, and in accordance with our recent decisions in *Cascades Containerboard Packaging—Niagara,* 370 NLRB No. 76 (2021), as modified in 371 NLRB No. 25 (2021); and *Paragon Systems,* 371 NLRB No. 104 (2022). Member Kaplan acknowledges and applies *Paragon Systems* as Board precedent, although he expressed disagreement there with the Board's approach and would have adhered to the position the Board adopted in *Danbury Ambulance,* 369 NLRB No. 68 (2020).

We shall substitute a new notice to conform to the Order as modified.

The Respondent asserts that the judge erred in declining to rule on its challenges to the propriety of President Biden's removal of former General Counsel Peter Robb and his appointment of Acting General Counsel Peter Sung Ohr. We have determined that such challenges to the authority of the Board's General Counsel based upon the President's removal of former General Counsel Robb have no legal basis. See *Aakash, Inc., d/b/a Park Central Care & Rehabilitation Center,* 371 NLRB No. 46, slip op. at 1–2 (2021). As discussed in *Aakash,* the Supreme Court's decision in *Collins v. Yellen,* ___ U.S. ___, 141 S.Ct. 1761, 1781–1783 (2021), forecloses any reasonable argument that the NLRA could be interpreted to limit the President's authority to remove General Counsel Robb. See also *Exela Enterprise Solutions, Inc. v. NLRB,* __ F.4th __, 2022 WL 1198200, at *5 (5th Cir. Apr. 22, 2022) (holding that the Act "does not provide tenure protections to the General Counsel of the Board" and that President Biden therefore lawfully removed former General Counsel Robb without cause). Member Kaplan acknowledges and applies *Aakash* as Board precedent, although he expressed disagreement there with the Board's approach and would have adhered to the position the Board adopted in *National Assoc. of Broadcast Employees and Technicians—The Broadcasting and Cable Television Workers Sector of the CWA, AFL–CIO, Local 51,* 370 NLRB No. 114, slip op. at 2 (2021). See *Aakash,* 371 NLRB No. 46, slip op. at 4–5 (Members Kaplan and Ring,

### Amended Conclusions of Law

Add the following as new Conclusion of Law 5 and re-number the remaining paragraphs accordingly:

"The Respondent violated Section 8(a)(1) of the Act by maintaining work rules from June 1, 2020 through March 30, 2021, that prohibit employees from disclosing information about wages, benefits, and other terms and conditions of employment."

### Amended Remedy

Having found that the Respondent engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Specifically, we amend the judge's remedy in the following respects.

In addition to the Board's standard remedies for specific violations in this case, the judge recommended a notice-reading remedy. We agree that a reading of the remedial notice is warranted here so that employees "will fully perceive that the Respondent and its managers are bound by the requirements of the Act." *Federated Logistics & Operations*, 340 NLRB 255, 258 (2003), review denied 400 F.3d 920 (D.C. Cir. 2005). The Board has found a notice-reading remedy appropriate where the employer's violations are so numerous and serious that a reading of the notice is warranted to dissipate the chilling effect of the violations on employees' willingness to exercise their Section 7 rights. See, e.g., *David Saxe Productions, LLC and V Theater Group, LLC*, 370 NLRB No. 103, slip op. at 6 (2021); *Postal Service*, 339 NLRB 1162, 1163 (2003). The Respondent's serious and pervasive unfair labor practices meet this standard. Moreover, as the judge found, based on the prior formal settlement without a non-admission clause, the Respondent has a history of egregious violations during the previous organizing campaign. See *Bodega Latina Corp. d/b/a El Super*, 367 NLRB No. 34, slip op. at 1 fn. 4 (2018) (finding that a formal settlement agreement without a non-admission clause can be used to establish a proclivity to violate the Act); *Camaco Lorain Mfg. Plant*, 356 NLRB 1182, 1189 (2011) (same). Under these circumstances, notice reading is """"an effective but moderate way to let in a warming wind of information and,

---

concurring). Moreover, Jennifer Abruzzo has now been nominated by the President, confirmed by the Senate, and appointed as the Board's General Counsel, precluding any claim that former General Counsel Robb somehow continued to hold that office. Finally, we are now beyond what would have been the end of former General Counsel Robb's term on November 17, 2021, which necessarily removes any doubt as to General Counsel Abruzzo's current authority.

We further note that on August 17, 2021, following her confirmation and swearing in, General Counsel Abruzzo submitted a Notice of Ratification approving the continued prosecution of the complaint, and on December 2, 2021, following what would have been the expiration of former General Counsel Robb's term had he remained in office, General Counsel Abruzzo issued a second Notice of Ratification in this case that states as follows:

> The prosecution of this case commenced under the authority of former Acting General Counsel Peter Sung Ohr when complaint issued on March 11, 2021.

> Respondent has alleged that the complaint was an ultra vires act by former Acting General Counsel Ohr, and was otherwise issued and prosecuted unlawfully. Specifically, Respondent has alleged that President Biden had unlawfully removed former General Counsel Peter B. Robb and unlawfully designated former Acting General Counsel Ohr.

> I was confirmed as General Counsel on July 21, 2021. My commission was signed and I was sworn in on July 22, 2021. On August 17, 2021, I ratified the issuance of the complaint and its continued prosecution in this case, as well as the Regional Director's filing and litigation of a Section 10(j) petition in *Goonan v. Amerinox Processing, Inc.*, No. 1:21-cv-11773-NLH-KMW (D.N.J.) (injunction granted 7/14/21). Respondent has challenged my August 17, 2021 ratification of those actions, and has continued to allege that the complaint and its prosecution were unlawful.

> Former General Counsel Robb's term has indisputably now expired. In an abundance of caution, I was re-sworn in on November 29, 2021. Following appropriate review and consultation with my staff, I have again decided, in an abundance of caution, to ratify the issuance of the

complaint and its continued prosecution in this case. Those actions were and are a proper exercise of the General Counsel's broad and un-reviewable discretion under Sec. 3(d) of the Act. I have also again reviewed and decided that the recommendation to the Board to seek injunctive relief, and the Regional Director's filing and litigation of a Sec. 10(j) petition in *Goonan v. Amerinox Processing, Inc.*, No. 1:21-cv-11773-NLH-KMW (D.N.J.), were and are proper.

> My action does not reflect an agreement with Respondent's argument in this case or arguments in any other case challenging the validity of actions taken following the removal of former General Counsel Robb. Rather, my decision is a practical response aimed at facilitating the timely resolution of the unfair-labor-practice allegations that I have found to be meritorious.

> For the foregoing reasons, I hereby ratify the issuance and prosecution of the complaint and all actions taken in this case subsequent to the removal of former General Counsel Robb, including by former Acting General Counsel Ohr and his subordinates.

Thus, in addition to relying on our holding in *Aakash*, we find that General Counsel Abruzzo's ratification renders the Respondent's argument moot. See *Wilkes-Barre Hospital Co. LLC, d/b/a Wilkes-Barre General Hospital*, 371 NLRB No. 55, slip op. at 1 fn. 2 (2022) (full-Board decision; collecting cases). Member Kaplan acknowledges and applies *Wilkes-Barre* as Board precedent, although he expressed disagreement there with the Board's approach, and he adheres to the views that he and Member Ring expressed in that case. See id.

We find it unnecessary to pass on the General Counsel's argument that the judge erred in declining to rule on the former Acting General Counsel's motion to strike the Respondent's defense that, regardless of the propriety of the removal of former General Counsel Robb, President Biden circumvented the Appointments Clause by designating Peter Ohr to serve as Acting General Counsel without Senate approval. That defense has been rendered moot as well in light of the Notices of Ratification discussed above.

more important, reassurance" to the bargaining unit employees that their rights under the Act will not be violated in the future.'" *Sunbelt Rentals, Inc.*, 370 NLRB No. 102, slip op. at 6 (2021) (quoting *International Shipping Agency, Inc.*, 369 NLRB No. 79, slip op. at 8 (2020) (quoting *J.P. Stevens & Co. v. NLRB*, 417 F.2d 533, 540 (5th Cir. 1969))).[6]

In ordering the notice-reading remedy, we specify that the notice shall be read to unit employees by the Respondent's president, Seth Young, who was personally involved in several of the serious unfair labor practices, or, at the Respondent's choice, by an agent of the Board with Young present.[7] In cases where a particular manager, to the knowledge of employees, was directly responsible for violations that justified the notice-reading remedy, the Board has required that individual (or a Board agent in that individual's presence) to read the notice in order to make the remedy fully effective. See, e.g., *AdvancePierre Foods*, 366 NLRB No. 133, slip op. at 5; *Ingredion, Inc. d/b/a Penford Products Co.*, 366 NLRB No. 74, slip op. at 1 fn. 2 (2018); *Domsey Trading Corp.*, 310 NLRB 777, 779–780 (1993), enfd. 16 F.3d 517 (2d Cir. 1994). Here, President Young told an employee that employees were not permitted to talk about the Union during working time and threatened to destroy those who support the Union.[8] The Respondent subsequently laid off/discharged over 60 percent of the union supporters immediately after learning of the renewed organizing campaign. The record establishes that Young was aware of and involved in these layoffs/discharges. See, e.g., *Wismettac Asian Foods, Inc.*, 370 NLRB No. 35, slip op. at 4, 53–54 (2020) (ordering notice reading by a high-ranking management

official where, among other violations, employer discriminatorily discharged and/or refused to rehire several employees), enfd. mem. No. 20-73768, 2022 WL 313776 (9th Cir. Feb. 2, 2022); *Kumho Tires Georgia*, 370 NLRB No. 32, slip op. at 1 fn. 5, 8 (2020) (ordering notice reading by respondent's president or chief people officer to help remedy employer's multiple violations in response to union organizing campaign); *Sysco Grand Rapids, LLC*, 367 NLRB No. 111, slip op. at 2 (2019) (ordering notice reading by president and division president when they were personally involved in unlawfully threatening the employees), enf. denied in relevant part mem. 825 Fed. Appx. 348 (6th Cir. 2020); *Bozzuto's*, 365 NLRB No. 146, slip op. at 5 (ordering notice reading by respondent's vice-president where he committed or was involved with many of the unfair labor practice violations).[9]

We also agree with the judge's recommendation that the Order contain a broad cease-and-desist provision. This remedy is appropriate when a respondent is shown to "have a proclivity to violate the Act or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights." *Hickmott Foods*, 242 NLRB 1357, 1357 (1979). Both standards are met here. First, as discussed above, the Respondent has demonstrated a proclivity to violate the Act. Moreover, the Respondent's serious unfair labor practices combined with its numerous violations addressed in the prior formal settlement demonstrate a general disregard for employees' fundamental Section 7 rights. Consequently, as the judge recommended, our Order includes a broad cease-and-desist provision.

---

[6] Member Prouty notes in this regard that the Board's administrative experience demonstrates the greater efficacy of notice reading in achieving the remedial objectives of the Act. Effective vindication of the rights guaranteed by the Act is fundamental to national labor policy in every case before the Board. Member Prouty would accordingly consider in a future appropriate proceeding expanding the scope of cases in which remedial relief encompasses notice reading.

[7] If Young is no longer employed by the Respondent, then the Respondent shall designate an equally high-ranking responsible management official to conduct or be present for the reading. See *AdvancePierre Foods, Inc.*, 366 NLRB No. 133, slip op. at 5 fn. 13 (2018), enfd. 966 F.3d 813 (D.C. Cir. 2020); *Bozzuto's Inc.*, 365 NLRB No. 146, slip op. at 5 (2017), enf. denied in relevant part 927 F.3d 672 (2d Cir. 2019).

[8] As the judge noted, the Respondent entered into an informal settlement of other earlier unfair labor practices dated April 26, 2019, which also required a notice reading. The judge observed that "before the reading was to occur, Respondent's President Seth Young held a meeting with employees in the breakroom to go through the notice and offer his personal views." These views, as reflected in a recording and transcript introduced by the General Counsel at the hearing in the instant case, included a statement by Young saying, "Now I'm going to read you guys these ridiculous things that I had to agree to with the NLRB. And if anybody feels any way about any of these things and wants to comment, I'm happy to stop the meeting. Feel free. Okay? I can't make this shit

up." Young also stated, "We will not discipline you because you participate in a case before the National Labor Relations Board, which I wish we could."

[9] Based on current Board law, Member Kaplan concurs with his colleagues that the remedy requires the notice be read to unit employees by the Respondent's president, Seth Young, or, at the Respondent's choice, by a Board agent with Young present.

The D.C. Circuit has found that the option of having a Board agent read the notice is sufficient to address First Amendment, and other, concerns surrounding the notice-reading remedy. See *HTH Corporation v NLRB.*, 823 F.3d 668, 675–678 (2016) (discussing First Amendment implications of the Board's notice-reading remedy, but upholding the remedy specifically because it gave the respondent the option of having a Board agent read the notice). Member Kaplan notes, however, that a different court, expressing "skepticism" regarding the public-notice-reading order, has noted that "many of the same concerns with the orders are present even when a board [agent] reads the order." *Denton County Elec. Coop. v. NLRB*, 962 F.3d 161, 174, 175 (5th Cir. 2020). Accordingly, although he concurs with the decision to order the remedy here, he would be open to reconsidering the issue in a future appropriate case.

4                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

In addition, we find merit in the General Counsel's and Charging Party's exceptions to the judge's failure to order a notice mailing and certain special union-access remedies. "The Board provides for the mailing of individual notices when posting will not adequately inform the employees of the violations that have occurred and their rights under the Act." *Bill's Electric, Inc.*, 350 NLRB 292, 297 (2007) (internal quotations omitted). Here, we agree with the General Counsel and the Charging Party that a notice mailing is justified in light of the Respondent's extensive and serious unfair labor practices, its recidivist conduct, and the fact that its President Seth Young made several disparaging remarks about a prior notice during a meeting of the Respondent's employees shortly before the reading of that notice required by the informal settlement agreement of April 26, 2019, which the Respondent subsequently failed to comply with. Further, a notice mailing will reach individuals who would not otherwise see the posted and read notice but who were impacted by the Respondent's unlawful conduct, such as former employees who now lack access to the Respondent's facility. See, e.g., *Veritas Health Services, Inc.*, 363 NLRB No. 108, slip. op. at 1 (2016) (finding a notice-mailing remedy was appropriate to effectuate the policies of the Act because "former employees lack[ed] access to the [r]espondent's facility and [would] not [have] see[n] the posted notice"), enfd. in relevant part 895 F.3d 69 (D.C. Cir. 2018); *Pacific Beach Hotel*, 361 NLRB 709, 715 (2014) (ordering a notice-mailing remedy where the employer's violations were

"unquestionably deliberate, targeted, and egregious" and the notice would reach individuals who no longer had access to the employer's facility but who were affected by the violations), enfd. in relevant part sub nom. *HTH Corp. v. NLRB*, 823 F.3d 668 (D.C. Cir. 2016). Specifically, numerous employees were laid off during the pandemic in June 2020, and there is no record evidence that they have returned to work. These former employees will not likely see the posted notice or hear the on-site reading of a notice. In addition, a notice-mailing remedy will give current and newly hired employees the necessary time and opportunity to read and understand the Respondent's violations and their rights in the privacy of their homes. See *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 4 (2018) (ordering a notice-mailing remedy where an employer committed numerous violations and employees therefore needed sufficient time to read and understand the violations and their rights set forth in a lengthy notice), enfd. mem. 779 Fed. Appx. 752 (D.C. Cir. 2019) (per curiam); *Pacific Beach Hotel*, 361 NLRB at 714–715 (ordering a notice-mailing remedy to afford employees "the opportunity to privately review the documents free from the [r]espondents' potential scrutiny for as long as necessary to understand their contents and as often as necessary to reinforce their rights in the future"). Accordingly, we shall require the Respondent to mail the notice to all current and former unit employees employed by the Respondent at any time from the onset of the unfair labor practices.[10]

---

[10] In ordering a notice-mailing remedy, we note that this established remedy is not solely dependent on evidence that a respondent has gone out of business. See *Newman Livestock-11, Inc.*, 361 NLRB 343, 344 (2014) (citing *3E Co.*, 313 NLRB 12, 12 fn. 2 (1993), enfd. 26 F.3d 1 (1st Cir. 1994). Rather, "[n]otice mailing is a well-established part of the Board's remedial repertoire when traditional posting is insufficient to dissipate the effects of the unfair labor practices." *Pacific Beach Hotel*, 361 NLRB at 714. For this reason, we have ordered notice mailing to both job applicants and existing employees. E.g., *Aerotek, Inc.*, 365 NLRB No. 2, slip op. at 4–5 (2016), enfd. in relevant part 883 F.3d 725 (8th Cir. 2018). We have also required notice mailings in cases of employee turnover, ordering mailings to former and current employees employed at any time since the onset of the unfair labor practices who have been impacted by the violations. E.g., *A.W. Farrell & Son, Inc.*, 361 NLRB 1487, 1487–1488 (2014). Such notice mailings have been ordered alongside ordinary electronic distribution of the notice without confusion. Additionally, the electronic distribution remedy is contingent on the employer customarily communicating with its employees by electronic means, and even if the employer customarily communicates with its employees by such means, employees may not be able to access the employer's electronic communications, such as communications through work email or a work intranet, outside of the workplace. Thus, the notice-mailing remedy ordered here will guarantee that employees have the necessary time and opportunity to read and understand the Respondent's violations and their rights in the privacy of their homes. Overall, in finding that a notice mailing is warranted here, we merely apply established precedent to ensure employees are fully informed of their rights and the nature of the Respondent's violations. See generally *Technology Service*

*Solutions*, 334 NLRB 116, 117 (2001) (ordering notice mailing and recognizing that "the Board crafts its posting requirements to ensure that a respondent employer actually apprises employees of the Board's decision and their rights under the Act," tailoring the requirement "to adapt to varying circumstances on a case-by-case basis").

In joining her colleague's order of notice mailing, Chairman McFerran also recognizes that the Respondent here created the impression of surveillance and committed other violations to discourage employees from engaging in Sec. 7 activity. Such activity would reasonably make employees reluctant to risk being observed by their employer if they tried to read a posted Board notice, thereby undermining the effectiveness of such a document. Chairman McFerran therefore considers notice mailing a particularly appropriate remedial option when a respondent has engaged in surveillance or demonstrated marked animus to protected activity.

Unlike his colleagues, Member Kaplan does not find that mailing the notice is warranted in the circumstances of this case. To begin, Member Kaplan notes that notice posting is the Board's traditional means of advising employees of their Section 7 rights and of a respondent's unlawful conduct. See, e.g., *Consolidated Edison Company of New York, Inc.*, 323 NLRB 910, 912 (1997) (finding that notice mailing was unnecessary where there was no evidence that traditional notice posting was insufficient to inform employees of their rights and of the employer's unfair labor practices). The Board does not require that notices be mailed to employees unless a traditional notice posting is inadequate to inform employees of their rights and of a respondent's unfair labor practices. *Peoples Gas System, Inc.*, 253 NLRB 1180, 1181 (1981). Indeed, a notice-mailing remedy that is not contingent on the respondent's having gone

AMERINOX PROCESSING, INC.                                    5

Moreover, in agreement with the General Counsel and the Charging Party, we find that certain special union-access remedies are warranted to dissipate the effects of the Respondent's extensive and serious unfair labor practices, and to ensure that a fair second election can be held. See *Sysco Grand Rapids*, 367 NLRB No. 111, slip op. at 3; *Monfort of Colorado*, 298 NLRB 73, 86 (1990), enfd. in relevant part 965 F.2d 1538 (10th Cir. 1992). We shall thus require the Respondent to grant the Union and its

representatives reasonable access to the Respondent's bulletin boards and all other places where notices to employees are customarily posted, and shall further order the Respondent to supply the Union, on its request, the names, addresses, telephone numbers, and personal email addresses of its current unit employees, to the extent that the Respondent already has unit employees' telephone numbers and personal email addresses.[11] See *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 5 (2019); *Sysco Grand*

out of business or having closed the facility involved in the proceeding is seldom granted. *Mondelez Global, LLC*, 369 NLRB No. 46, slip op. at 5 (2020), citing *Delta Sandblasting Co.*, 367 NLRB No. 17, slip op. at 1 fn. 3 (2018).

Further, in Member Kaplan's view, the extent of the Respondent's misconduct here does not warrant a departure from well-settled Board remedial principles. He also rejects his colleagues' contention that a notice mailing is necessary so that former employees who were affected by the Respondent's violations, including those laid off in June 2020, will be able to see the posted notice. The Board has not traditionally ordered notices to be mailed to unlawfully discharged employees. *Mondelez Global*, 369 NLRB No. 46, slip op. at 5. As the Board has recognized, "it is *always* the case that employees who worked for an employer at the time it committed an unfair labor practice may no longer be working for that employer when the remedial notice is posted, and the Board *rarely* orders notice mailing." *Delta Sandblasting Co.*, 367 NLRB No. 17, slip op. at 1 fn. 3 (2018) (emphasis in original). Member Kaplan also takes issue with his colleagues' claim that a notice-mailing remedy will provide employees sufficient time and opportunity to read and understand the notice. This is not a situation where the notice is extraordinarily long or complicated so that employees would benefit from having the opportunity to review their own copy. In addition, he notes that multiple notices may be as likely to cause confusion as they are to provide clarity, as employees could reasonably conclude that the mailed notice, the electronic notice, and the posted notice represent separate cases and violations of the Act. Finally, Member Kaplan recognizes that his colleagues correctly observe that the Board has found notice-mailing remedies appropriate in cases where either existing employees work off-site or there has been significant employee turnover. See *Aerotek*, 365 NLRB No. 2, slip op. at 4–5, and *A.W. Farrell & Son*, 361 NLRB at 1487–1488. However, there is no evidence that such circumstances exist here. In sum, Member Kaplan believes that traditional notice posting is sufficient to apprise the employees of their rights and of the unlawful conduct engaged in by the Respondent and that electronic distribution of the notice fully addresses his colleagues' specific concerns.

[11] We see no reason here—where our remedial goal is to grant the Union meaningful access to employees, to redress the effects of the Respondent's coercive conduct and to ensure that a fair second election can be held—why the Union should not be provided with employee email addresses and telephone numbers that are available to the Respondent itself. As the Board has recognized in the representation election context, "[c]ommunications technology and campaign communications have evolved far beyond the face-to-face to conversation on the door step," and the disclosure of available personal email addresses and telephone numbers prior to an election helps to ensure the fair and free choice of bargaining representatives by more effectively facilitating a fully informed electorate. See 79 Fed.Reg. 74308, 74335–74341 (Dec. 15, 2014). Where, as here, an employer's employees have reason to fear discussing unionization in the workplace because of the employer's extensive unlawful conduct in the past, ordering the employer to provide available personal email addresses and telephone numbers, in addition to names and addresses, will enable the union to use highly effective modern methods of communication "'to contact all employees outside the

[workplace] and to present its message in an atmosphere relatively free of restraint and coercion,'" and will more likely "restor[e] the conditions that are a necessary prelude to a free and fair election." *Blockbuster Pavillion*, 331 NLRB 1274, 1275 (2000) (first alteration in original; second alteration added) (quoting *Loray Corp.*, 184 NLRB 557, 559 (1970)). In ordering this remedy, we note that the consolidated complaint here requests that the Respondent be ordered to "supply the Union, on its request, with the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular ('cell') telephone numbers) of all current production, maintenance, and shipping/receiving employees." In her cross-exceptions brief, the General Counsel repeats the request for "employee contact information," which we do not read to exclude email addresses and telephone numbers. In any event, the Board's well-established precedent allows us to tailor a remedy to the facts of a case, independently of the specific relief requested by the General Counsel. *Pacific Beach Hotel*, 361 NLRB at 710 (citing cases).

Member Kaplan agrees with his colleagues that the Respondent should be required to give the Union the names and addresses of its current employees in order to restore the conditions that are a necessary prelude to a free and fair second election. However, Member Kaplan does not believe that this extraordinary remedy of ordering an employer to provide a union with employees' contact information should also include the employees' telephone numbers and personal email addresses. In this respect, the Board has generally limited this special remedy to only requiring an employer to provide the union with the names and addresses of current employees. See, e.g., *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 5; *Sysco Grand Rapids, LLC*, 367 NLRB No. 111, slip op. at 3; *Federated Logistics*, 340 NLRB 255, 258 (2003), enfd. 400 F.3d 920 (D.C. Cir. 2005); *Excel Case Ready*, 334 NLRB 4, 5 (2001). Indeed, the Board has referred to this special remedy as the "names and addresses remedy." See *Blockbuster Pavilion*, 331 NLRB 1274, 1275 (2000) (noting that the "names and addresses remedy" seeks to level a playing field that was tilted by the employer's serious unfair labor practices). *Novelis Corp.*, 367 NLRB No. 47, slip op. at 2 (2018), cited by the majority, is the only case that Member Kaplan is aware of where the Board has also ordered an employer to supply the union with the telephone numbers and personal email addresses of its current unit employees in addition to their names and addresses. Although Member Kaplan agreed to this remedy in *Novelis*, that case is distinguishable. In *Novelis*, the Second Circuit had denied enforcement of the Board's *Gissel* bargaining order and remanded. In light of that, the General Counsel requested on remand that the Board order the respondent to provide the union the names, addresses, telephone numbers, and email addresses of its current employees, and the Board granted the request. Here, however, the General Counsel only argues that the Union needs the "*names and addresses* of Respondent's current employees to neutralize the frustrating effects of Respondent's persistent illegal activity" (emphasis added). Member Kaplan finds that providing the names and addresses of the employees would be sufficient to enable the Union to communicate with employees in an atmosphere free of restraint and coercion.

6                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*Rapids*, 367 NLRB No. 111, slip op. at 3; *Novelis Corp.*, 367 NLRB No. 47, slip op. at 2 (2018).[12]

We also find that an additional extraordinary remedy is appropriate here to dissipate the effects of the Respondent's extensive and serious unfair labor practices. We shall require the Respondent to post, read, and mail an Explanation of Rights in order to fully inform employees, supervisors, and managers of the employees' rights under the Act.[13] Such a document will help to undo the likely impact of the Respondent's egregious and pervasive unfair labor practices on employees and help remedy the chilling effect of the Respondent's conduct. See, e.g., *David Saxe Productions*, 370 NLRB No. 103, slip op. at 6; *Purple Communications, Inc.*, 370 NLRB No. 26, slip op. at 1 fn. 5, 57 & fn. 85 (2020); *Pacific Beach Hotel*, 361 NLRB at 714. The Explanation of Rights, which is attached as Appendix B to this Decision and Order, sets out the employees' core rights under the Act, coupled with clear general examples that are specifically relevant to the unfair labor practices found in this case.

ORDER

The National Labor Relations Board orders that the Respondent, Amerinox Processing, Inc., Camden, New Jersey, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Discharging, laying off, or otherwise discriminating against employees because of their support for a union or because other employees support a union.

(b) Creating the impression that it is engaged in surveillance of its employees' union or other organizational activities.

(c) Threatening employees with discharge or other retaliation if they choose to be represented by or support a union.

(d) Prohibiting employees from discussing a union during working time while permitting them to discuss other subjects unrelated to work.

(e) Telling employees they are being removed prior to the time of their resignation because of their support for a union.

(f) Maintaining work rules that prohibit employees from discussing their wages, benefits, or other terms or conditions of employment.

(g) In any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the polices of the Act.

(a) To the extent it has not already done so, rescind the rules in its employee handbook that prohibit the discussion of wages, benefits, or other terms or conditions of employment.

(b) Furnish all current employees with inserts for the current Employee Manual and current Progressive Disciplinary Policy that (1) advise that the unlawful provisions have been rescinded, or (2) provide a lawfully worded provision on adhesive backing that will cover the unlawful provisions; or publish and distribute to all current employees a revised Employee Manual and revised Progressive Disciplinary Policy that (1) do not contain the unlawful provisions, or (2) provide lawfully worded provisions.

(c) Within 14 days from the date of this Order, offer Miguel Gonzalez, Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable full reinstatement to their

---

[12] The General Counsel and the Charging Party have also excepted to the judge's failure to grant the Acting General Counsel's request that the Respondent provide the Union with access to non-work areas of the Respondent's facility during non-work time and afford the Union the right to deliver a 30-minute speech to employees on working time prior to any future Board election in which the Union is a participant. We believe that the special remedies that we have ordered are sufficient to remedy the Respondent's extensive and serious unfair labor practices.

Member Prouty would order the Respondent to provide the Union with reasonable access to employees in nonwork areas during nonwork time for a period of 1 year from the date on which the notice is posted, notice of and equal time to respond to any address made by the Respondent to its employees concerning union representation for a period of 1 year from the date on which the notice is posted, and access to deliver a 30-minute speech to employees during work time prior to a Board election if the Union is a participant in a Board election at any time during the 1 year following the date on which the notice is posted. He believes that these additional special access remedies are warranted to dissipate fully the coercive effects of the numerous, pervasive, and outrageous unfair labor practices committed by the Respondent and to ensure that a fair second election can be held, if necessary, particularly in light of the Respondent's history of pervasive illegal conduct evidenced by the prior formal settlement agreement without a non-admission clause referenced

above. The Respondent "has taken swift and widespread action each time its employees have attempted to enlist the aid of the Union, and its actions have clearly been aimed at ensuring that employees think twice before doing so again." *United States Service Industries*, 319 NLRB 231, 232 (1995) (ordering the employer to, among other things, grant the union reasonable access to its employees in nonwork areas during nonwork time), enfd. mem. per curiam 107 F.3d 923 (D.C. Cir. 1997). Accordingly, in Member Prouty's view, these special access remedies, in addition to the special access remedies ordered above, are necessary to afford the Union "an opportunity to participate in [the] restoration and reassurance of employee rights by engaging in further organizational efforts, if it so chooses, in an atmosphere free of further restraint and coercion." *United Dairy Farmers Cooperative Assn.*, 242 NLRB 1026, 1029 (1979), enfd. in relevant part 633 F.2d 1054 (3d Cir. 1980).

[13] For the same reasons as explained regarding the notice reading above, we shall require that the Explanation of Rights be read along with the notice to unit employees by the Respondent's president, Seth Young, or, at the Respondent's choice, by an agent of the Board with Young present. For the reasons he states above, Member Kaplan concurs in this remedy.

former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

(d)  Make Kyle George, Miguel Gonzalez, Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable whole for any loss of earnings and other benefits suffered as a result of the discrimination against them, in the manner set forth in the remedy section of the judge's decision.

(e)  Compensate Kyle George, Miguel Gonzalez, Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and file with the Regional Director for Region 4, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years for each of them.

(f)  File with the Regional Director for Region 4, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W-2 form(s) reflecting his backpay award.

(g)  Within 14 days from the date of this Order, remove from its files any references to the unlawful separation of Kyle George, the unlawful termination of Miguel Gonzalez, and the unlawful layoffs of Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable, and within 3 days thereafter notify them in writing that this has been done and that the separation, discharge, and layoffs will not be used against them in any way.

(h)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(i)  Post at its facility in Camden, New Jersey, copies of the attached notice marked "Appendix A" and the attached

Explanation of Rights marked "Appendix B."[14]  Copies of the notice and Explanation of Rights, on forms provided by the Regional Director for Region 4, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, the notice and Explanation of Rights shall be distributed electronically, such as by email, posting on an intranet or internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  Reasonable steps shall be taken by the Respondent to ensure that the notices and Explanation of Rights are not altered, defaced, or covered by any other material.

(j)  Within 14 days after service by the Region, duplicate and mail, at its own expense, after being signed by the Respondent's authorized representative, copies of the attached notice marked "Appendix A" and the attached Explanation of Rights marked "Appendix B" to all current and former unit employees employed by the Respondent at its Camden, New Jersey facility at any time since June 1, 2020.

(k)  Hold a meeting or meetings during working hours, scheduled to ensure the widest possible attendance of employees, at which the attached Notice to Employees marked "Appendix A" and the attached Explanation of Rights marked "Appendix B" will be read to the employees in English and Spanish by President Seth Young (or, if he is no longer employed by the Respondent, by an equally high-ranking responsible management official of the Respondent) in the presence of a Board agent and, if International Association of Sheet Metal, Air, Rail & Transportation Workers, Sheet Metal Workers Local 19 (the Union) so desires, a Union representative, or, at the Respondent's option, by a Board agent in the presence of Seth Young (or an equally high-ranking management official if Young is no longer employed by the Respondent), and, if the Union so desires, a Union representative.[15]

(l)  Immediately on request of the Union, for a period of 2 years from the date on which the notice is posted or until

[14] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted and Mailed by Order of the National Labor Relations Board" shall read "Posted and Mailed Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[15] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice and the Explanation of Rights must be posted and read within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice and the Explanation of Rights must be posted and read within 14 days after the facility reopens

and a substantial complement of employees returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice and the Explanation of Rights must also be posted by such electronic means within 14 days after service by the Region. If the notice and the Explanation of Rights to be physically posted was posted electronically more than 60 days before physical posting of the notice and the Explanation of Rights, the notice and the Explanation of Rights shall state at the bottom that "This notice [or Explanation of Rights] is the same notice [or Explanation of Rights] previously [sent or posted] electronically on [date]."

8                   DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

the Regional Director has issued an appropriate certification following a free and fair election, whichever comes first, grant the Union and its representatives reasonable access to the Respondent's bulletin boards and all places where notices are customarily posted at its Camden, New Jersey facility.

(m)  Supply the Union, on its request, with the full names, addresses, telephone numbers, and personal email addresses of its current unit employees, to the extent that it already has current unit employees' telephone numbers and personal email addresses, updated every 6 months, for a period of 2 years or until a certification after a fair election.

(n)  Within 21 days after service by the Region, file with the Regional Director for Region 4 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  June 3, 2022

_____
Lauren McFerran,                    Chairman

_____
Marvin E. Kaplan,                    Member

_____
David M. Prouty,                    Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT discharge you, lay you off, or otherwise discriminate against you in any way because you support a union or because other employees support a union.

WE WILL NOT create the impression that we are engaged in surveillance of your union or other organizational activity.

WE WILL NOT threaten you with discharge or other retaliation if you choose to be represented by or support a union.

WE WILL NOT prohibit you from discussing a union during working time while permitting you to discuss other subjects unrelated to work.

WE WILL NOT tell you that you are being removed prior to the time of your resignation because of your support for a union.

WE WILL NOT maintain work rules that prohibit you from discussing salary or wage information, hours, or other terms or conditions of employment.

WE WILL NOT in any other manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, to the extent we have not already done so, rescind the rules in our employee handbook that prohibit you from discussing your wages, benefits, or other terms or conditions of employment.

WE WILL, to the extent we have not already done so, furnish you with inserts for the current Employee Manual and current Progressive Disciplinary Policy that (1) advise that the unlawful provisions have been rescinded, or (2) provide a lawfully worded provision on adhesive backing that will cover the unlawful provisions; or publish and distribute to you a revised Employee Manual and revised Progressive Disciplinary Policy that (1) do not contain the unlawful provisions, or (2) provide lawfully worded provisions.

WE WILL, within 14 days from the date of the Board's Order, offer Miguel Gonzalez, Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

WE WILL make Miguel Gonzalez, Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable whole for any loss of earnings and other benefits suffered as a result of the discrimination against them, less any net interim earnings, plus interest, and WE WILL also make them whole for reasonable search-for work and interim employment expenses, plus interest.

WE WILL make Kyle George whole for any loss of earnings and other benefits suffered during the 2 weeks he would have worked had we not removed him 2 weeks

AMERINOX PROCESSING, INC.                                    9

prior to the time his resignation would have been effective, plus interest.

WE WILL compensate Kyle George, Miguel Gonzalez, Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and WE WILL file with the Regional Director for Region 4, within 21 days of the date the amount of backpay is fixed, either by agreement or Board Order, a report allocating the backpay awards to the appropriate calendar years for each employee.

WE WILL file with the Regional Director for Region 4, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W-2 form(s) reflecting the backpay award.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any references to the unlawful separation of Kyle George, the unlawful termination of Miguel Gonzalez, and the unlawful layoffs of Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable, and WE WILL, within 3 days thereafter, notify them in writing that this has been done and that our unlawful actions will not be used against them in any way.

WE WILL hold a meeting or meetings during working hours and have this notice and the Board's Explanation of Rights read to you and your fellow workers in English and Spanish by President Seth Young (or, if he is no longer employed by the Respondent, by an equally high-ranking responsible management official of the Respondent) in the presence of a Board agent and, if International Association of Sheet Metal, Air, Rail & Transportation Workers, Sheet Metal Workers Local 19 (the Union) so desires, a Union representative or, at our option, by a Board agent in the presence of Young (or another equally high-ranking management official if Young is no longer employed by the Respondent) and, if the Union so desires, a Union representative.

WE WILL, immediately on request of the Union, for a period of 2 years from the date on which the notice is posted or until the Regional Director has issued an appropriate certification following a free and fair election, whichever comes first, grant the Union and its representatives reasonable access to the Respondent's bulletin boards and all places where notices are customarily posted at its Camden, New Jersey facility.

WE WILL supply the Union, on its request, with the full names, addresses, telephone numbers, and personal email addresses of our current unit employees, to the extent that we already have current unit employees' telephone numbers and personal email addresses, updated every 6

months, for a period of 2 years or until a certification after a fair election.

AMERINOX PROCESSING, INC.

The Board's decision can be found at https://www.nlrb.gov/case/04-CA-268380 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



APPENDIX B

EXPLANATION OF RIGHTS
POSTED AND MAILED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

Employees covered by the National Labor Relations Act have the right to join together to improve their wages and working conditions, including by organizing a union and bargaining collectively with their employer, and also the right to choose not to do so. This Explanation of Rights contains important information about your rights under this Federal law.

The National Labor Relations Board has ordered your employer, Amerinox Processing, Inc., to provide you with this Explanation of Rights to describe your rights and to provide examples of illegal behavior.

Under the National Labor Relations Act, you have the right to

    • Organize a union to negotiate with your employer concerning your wages, hours, and working conditions.

    • Discuss your wages, benefits, and other terms and conditions of employment with your coworkers or Union representatives.

    • Take action with one or more coworkers to improve your working conditions.

    • Choose not to do any of these activities.

It is illegal for your employer to take any adverse action against you because you formed, joined, assisted, or supported the Union or any other labor organization, expressed

10                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

support for unions in general, or took action with one or more coworkers to improve your working conditions, or to discourage you from doing so.  Prohibited adverse actions include

  discharge

  layoff

It is also illegal for your employer to

  • Give you the impression that your union activities are under surveillance.

  • Threaten you with discharge or other retaliation if you choose to be represented by or support a union.

  • Prohibit you from discussing a union during working time while permitting you to discuss other subjects unrelated to work.

  • Tell you that you are being removed prior to the time of your resignation because of your support for a union.

  • Maintain work rules that prohibit you from discussing salary or wage information, hours, or other terms or conditions of employment.

Illegal conduct will not be permitted.  The National Labor Relations Board enforces the Act by prosecuting violations.  If you believe your rights or the rights of others have been violated, you should contact the NLRB promptly to protect your rights, generally within 6 months of the unlawful activity.  You may contact the NLRB about a possible violation without your employer or anyone else being informed that you have done so.  The NLRB will conduct an investigation of possible violations if a charge is filed.  Charges may be filed by any person and need not be filed by the employee directly affected by the violation.

You can contact the NLRB's regional office, located at 100 East Penn Square, Suite 403, Philadelphia, PA 19107–6293.

Or you can contact the NLRB by calling (215) 597–7601.

For more information about your rights and about the National Labor Relations Board and National Labor Relations Act, visit the Agency's website: https://www.nlrb.gov.

**This is an official Government Notice and must not be defaced by anyone.**

*Lea F. Alvo-Sadiky* and *Alvina Swati, Esqs.,* for the Acting

General Counsel.
*Daniel V. Johns* and *Kelly T. Kindig, Esqs.,* for the Respondent.
*Martin W. Milz, Esq.,* for the Charging Party.

DECISION

INTRODUCTION[1]

ANDREW S. GOLLIN, ADMINISTRATIVE LAW JUDGE.  In July 2018, the International Association of Sheet Metal, Air, Rail & Transportation Workers, Sheet Metal Workers Local 19 (Union) petitioned to represent employees of Amerinox Processing, Inc. (Respondent).  After losing the election, the Union filed unfair labor practice charges and objections.  Respondent entered two informal settlements to resolve these and other allegations, but both were set aside when new charges were filed.  In December 2019, Respondent entered a formal settlement, which included a rerun election as one of the remedies.  However, in May 2020, the Union withdrew its petition to represent Respondent's employees.

In late September 2020, employees Kyle George, Joseph Soto, Keon Smith, and Miguel "Taz" Gonzalez discussed restarting the organizing campaign.  George contacted the Union and obtained paper authorization cards.  On Monday, October 19, he and Gonzalez handed out those cards to a few coworkers before work and during their morning break.  Later that morning, the Union texted employees a link to a digital authorization card to sign if they wanted the Union to represent them.  Within a few hours of this, Respondent removed George, discharged Gonzalez, and laid off Soto, Smith, Andrew Rodriguez, and Bernard Venable.  All except Venable had signed an authorization card.

The Acting General Counsel alleges Respondent took these adverse actions because of the renewed organizing campaign, and to discourage employees from supporting the Union, in violation of Section 8(a)(3) and (1) of the National Labor Relations Act (the Act).  Respondent denies the allegations.  It contends it removed George, rather than let him work his final two weeks after giving notice that he was resigning, because of his errors performing an earlier job; it discharged Gonzalez because he threatened an employee with violence; and it laid off the others because of significant business losses caused by the Coronavirus (COVID-19) pandemic.

The Acting General Counsel further alleges Respondent, through its managers and supervisors, threatened employees with discharge if they supported or engaged in union activity, told employees they were separated because of their support for the Union, created the impression among employees that their union activities were under surveillance, prohibited employees from discussing the Union during work time while allowing discussions of other non-work topics, and maintained a rule prohibiting employees from disclosing their wages, benefits, and terms and conditions of employment, in violation of Section 8(a)(1) of the Act.  Respondent also denies these allegations.  Respondent also raises certain affirmative defenses.

As discussed below, I find the violations as alleged and recommend an appropriate remedial order.

---

[1]  Abbreviations are as follows: "Tr." for transcript; "GC Exh." for the Acting General Counsel's Exhibits; and "R. Exh." for Respondent's Exhibits.  Although I have included citations to the record to highlight

particular testimony or exhibits, my findings and conclusions are based on my review and consideration of the entire record.

AMERINOX PROCESSING, INC.                                            11

The Union filed unfair labor practice charges against Respondent in Cases 04–CA–268380, 04–CA–268386, and 04–CA–268398 on October 30, 2020, and filed a charge against Respondent in Case 04–CA–272035 on February 1, 2021. On March 16, 2021, the Union filed a charge against Respondent in Case 04–CA–274177. On April 8, 2021, the Acting General Counsel, through the Regional Director for Region 4, issued an amended consolidated complaint in these five consolidated cases. On April 22, 2021, Respondent answered, denying the alleged violations and raising various affirmative defenses.

The hearing occurred via Zoom for Government videoconferencing on May 5–7, 2021 due to the compelling circumstances created by the COVID-19 pandemic. At the hearing, all parties were afforded the right to call and examine witnesses, present any relevant documentary evidence, and argue their respective legal positions. All parties filed post-hearing briefs, which I have carefully considered.[2]

FINDINGS OF FACT[3]

Background

*Jurisdiction, Labor Organization Status, and Supervisory/Agency Status*

At all material times, Respondent has been a corporation with an office and place of business in Camden, New Jersey, and has been engaged in the processing of steel and aluminum. During the past 12 months, Respondent sold and shipped from its Camden facility goods valued in excess of $50,000 directly to customers outside the State of New Jersey. Respondent admits, and I find, that at all material times it has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act, and the Union has been a labor organization within the meaning of Section 2(5) of the Act.

Seth Young is Respondent's President. His son, Max Young, is Director of Operations and Human Resources. Bob Carter is the Chief Financial Officer. Chris Fagan is Vice President of Sales & Marketing. Chuck Hahn is the Plant Manager. Stacey Schmidt is the Assistant Plant Manager. Joe Wilson is the Shipping and Receiving Manager. (GC Exh. 6.) At all material times, these individuals have been admitted supervisors and agents within the meaning of Section 2(11) and (13) of the Act.

Respondent's Camden facility consists of several numbered buildings with offices and equipment. There also is a gated parking lot where employees park their vehicles. Max Young has an office with a window view out to the parking lot.

*Prior Unfair Labor Practices and Objections, Informal Settlements, and Formal Settlement*

On July 17, 2018, the Union filed a petition seeking to represent Respondent's production, maintenance, and shipping/receiving employees at its Camden facility. The election was conducted on October 25, 2018, and the Union lost 41–5. (GC Exh. 2.) The Union filed numerous unfair labor practice charges and objections to conduct affecting the results of the election. On November 29, 2018, the Regional Director issued a consolidated complaint against Respondent alleging violations of Section 8(a)(1) and (3) and scheduled a hearing. The complaint was later amended. On January 22, 2019, Respondent entered an informal settlement in which it agreed to take certain steps to remedy the violations. Respondent failed to comply with terms of that settlement. On April 26, 2019, based upon additional charges, Respondent entered into a second informal settlement agreement, which was approved on April 26, 2019, in which it agreed to take certain actions to remedy the additional unfair labor practices and the noncompliance with the first informal settlement. It also required a rerun election. (GC Exh. 2.)

The informal settlement required a notice reading at Respondent's facility at a meeting of all employees. On April 25, 2019, before the reading was to occur, Respondent's President Seth Young held a meeting with employees in the breakroom to go through the notice and offer his personal views. Richard Bilo, a former employee, used his cell phone to record Young's statements. A transcript of that recording was later prepared. According to the recording/transcript, Young made the following statements:

> Now I'm going to read you guys these ridiculous things that I had to agree to with the NLRB. And if anybody feels any way about any of these things and wants to comment, I'm happy to stop the meeting. Feel free. Okay? I can't make this shit up.

(GC Exh. 5(c), pg. 4.)

> We will not discipline you because you participate in a case before the National Labor Relations Board, which I wish we could.

(GC Exh. 5(c), pg. 5.)

---

[2] On June 17, 2021, the Acting General Counsel moved to strike portions of Respondent's post-hearing brief challenging President Biden's designation of Acting General Counsel Peter Ohr because he "was never confirmed by the Senate." The Acting General Counsel contends Respondent's answer only challenged Ohr's designation on the basis that no vacancy existed for him because his predecessor was improperly terminated, and at the hearing it made no attempt to raise a constitutional argument about Ohr's lack of Senate confirmation; therefore, Respondent's "new argument" should be stricken. On June 24, Respondent opposed the motion stating the defense at issue was sufficiently plead in its answer. The Board held in *NABET*, 370 NLRB No. 114 (2021), that it will not exercise its jurisdiction to review the actions of the President regarding the removal of the General Counsel, which I find would include the appointment of the Acting General Counsel. I, therefore, decline to rule on the motion or the defense(s).

[3] The Findings of Fact are a compilation of the credible testimony and other evidence, as well as logical inferences drawn therefrom. To the extent testimony contradicts with the findings herein, such testimony has been discredited, either as in conflict with credited evidence or because it was incredible and unworthy of belief. In assessing credibility, I relied upon witness demeanor, the quality of their recollection, testimonial consistency, the presence or absence of corroboration, the weight of the respective evidence, established or admitted facts, inherent probabilities, and reasonable inferences that may be drawn from the record as a whole. See *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001). Certain credibility determinations are set forth below.

12                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

And I'm going to post the charges that were lodged against us, some of which you guys have seen, some of which you haven't because they won't bother you with such bullshit. Okay? But here's the effect. So I'll post these charges so you can see what they were about, who filed them, why they were filed. And you make up your own minds what you think about all of these actions. Okay?

I think I know what you'll determine. You're a bunch of bright guys. You're part of the team. You know how we treat each other. You know how we stand up against evil as a team. We don't let anybody shit in our house. Okay?

So if one of you guys did something really, really wrong, okay, and you knew it was wrong, and you got disciplined, I don't think you'd go running to the NLRB, wah, wah, wah, they disciplined me. I fucked this up and I got disciplined. Give them charges. Okay? (Indiscernible) you take medicine and you try not to do that shit again. Okay, we're on this.

We all know why this is happening. We all know why the charges are filed. It's to fuck us, cost us time, cost us aggravation, and delay the inevitable, which is a win. It's that simple.

(GC Exh. 5(c), pgs. 9–10.)

So stay the course. Don't get sucked into the nonsense. Don't let anybody instigate a problem where you'll be in trouble and you won't file a charge. Okay?

(GC Exh. 5(c), pg. 11.)

The Union later filed additional charges against Respondent.

The Regional Director concluded that Respondent had not complied with the terms of the second informal settlement, and, on November 1, 2019, issued an amended consolidated complaint covering all the allegations, including those previously settled. On December 2, 2019, Respondent entered a formal settlement without a non-admissions clause. The Board later issued an order approving the formal settlement on February 4, 2020. (GC Exh. 3). Among the remedies, the order provided for a rerun election.[4] On April 23, 2020, the U.S. Court of Appeals for the Third Circuit enforced the Board's order. (GC Exh. 4).

Alleged Unfair Labor Practices

*March 2020 Voluntary Layoffs, Withdrawal of Petition, and June 2020 Recalls and Layoffs*

In early 2020, Respondent experienced a reduction in business. In March 2020,[5] it eliminated its night shift, and it allowed employees to take a voluntary layoff if they felt uncomfortable working due to the pandemic. By late April, 13 of Respondent's nearly 50 employees had accepted voluntary layoff, including machine operators Kyle George and Miguel "Taz" Gonzalez. (GC Exh. 7.)

On around May 4, the Union withdrew its petition, citing the pandemic and its concerns about having a fair election. After the Union withdrew its petition, Seth Young held a meeting to tell employees that the Union was gone and not coming back. (Tr. 169.)

In early June, Respondent recalled seven of the laid off employees, including George and Gonzalez. At around this same time, Respondent permanently laid off five other employees.[6] (GC Exh. 7.)

*Employee Manual Provisions*

Also, in June, Respondent held an employee meeting where it

---

[4] The Board's order required Respondent to cease and desist from: threatening employees with discipline, discharge, layoff, closing the facility or employer, different terms and conditions of employment, enforcement or stricter enforcement of rules, or other specified or unspecified reprisals if they choose to be represented by or support a union; threatening to withhold pay raises and bonuses for as long as there is union activity at the facility; prohibiting employees from wearing insignia referring to a union or working conditions; creating the impression that it is engaged in the surveillance of its employees' union or other protected concerted activity; threatening employees with the loss of raises or benefits or other specified or unspecified reprisals if they associate with a union or its supporters; prohibiting employees from discussing a union during working time while permitting them to discuss other subjects unrelated to work; indicating to employees that they are being discharged because of their support for or affiliation with a union; confiscating union materials from its employees; indicating to employees that they are not receiving bonuses or additional pay because there is union activity at the facility; soliciting employee complaints and grievances and implicitly promising to remedy those complaints and grievances in response to union activity at the facility; promising employees different terms and conditions of employment, more influence with management, or other specified or unspecified benefits in response to union activity at the facility; interrogating employees about employee support for or sympathy toward a union; instructing employees to stop other employees from discussing a union; indicating to employees that union supporters cannot discuss a union during working time, even though the discussion of other subjects unrelated to work is permitted; threatening employees

with discipline or other specified or unspecified reprisals for contacting, seeking assistance from, filing charges with, or cooperating with the Board; equating contacting, seeking assistance from, filing charges with, or cooperating with the Board with disloyalty; promising to forgive or reward employees who abandon their support for a union; discharging or disciplining any of its employees or in any other manner discriminating in regard to hire or tenure of employment or any other term or condition of employment, in order to discourage membership in or support for a union; and in any like or related manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form labor organizations, to join or assist a union, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities. It also requires that Respondent pay backpay to multiple discharged employees (who waived reinstatement). (GC Exhs. 3-4).

[5] Hereinafter, all dates refer to 2020, unless otherwise stated.

[6] According to Seth Young, Respondent evaluated employees for layoff in late May based on a multitude of factors, including: the quality of their work and their ability to follow the company's standard operating procedures; their attendance; their work ethic and ability to get along with coworkers; and their overall job performance. (Tr. 460-461). In late May, Max Young prepared a memo identifying 10 employees for layoff and how they fared in each of these categories. (R. Exh. 47). Joseph Soto and Bernard Venable were among those considered but not selected at the time.

AMERINOX PROCESSING, INC.                                13

issued a new Employee Manual to all employees. The Manual contains the following provisions:

*L. Performance, Behavior Expectations and Discipline*

As an employee, you have various responsibilities, and must follow acceptable principles in matters of personal conduct on the job and exhibit a high degree of personal integrity by following all company rules and policies. Any Employee who fails to follow company rules and procedures is committing an infraction. There are two categories of infractions, "Minor Infractions," which result in Progressive Disciplinary Action, and "Major Infractions," which are handled on a case-by-case basis by an appointee of Company President and can result in disciplinary action up to and including termination.

. . .

2. Major Infractions: some types of behavior and conduct that are unacceptable and grounds for bypassing progressive disciplinary action and are grounds for immediate termination include, but are not limited to, the following:

. . .

• Unauthorized disclosure of confidential information. Confidential information includes information about wages, benefits, other terms and conditions of employment, and the identities of employees.

(GC Exh. 9, pp 20–21.)

*V. Confidential Information/Non-Disclosure*

. . .

The protection of confidential business information and trade secrets is vital to the interests and the success of Amerinox. Such confidential information includes, but is not limited to, the following examples:

. . .

Wages and benefits

Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

---

[7] On March 30, 2021, Respondent revised these provisions and provided the Acting General Counsel with a revised copy of the Employee Manual and Disciplinary Policy. (Tr. 488-489). According to Seth Young, Respondent revised its policies, distributed them to the employees, and the employees signed off on their receipts. (Tr. 489). Respondent did not provide the Acting General Counsel with any evidence showing that copies of the Manual revisions and Policy revisions were distributed to all employees. Respondent also did not provide any evidence showing that it either admitted to any wrongdoing or explained to its employees the import of the revisions.

[8] Seth Young testified to having no specific recollection of this conversation, but said he could have told an employee that they were not permitted to talk about the Union during working time, and that he had been given legal advice "that employees could chat about the union all they liked before work, during break, during lunch, after work." (Tr. 485). Respondent maintains a non-solicitation policy in its Employee Manual that states:

(GC Exh. 9, pp. 25–26.)

Progressive Disciplinary Policy

. . .

Employees who engage in any of the Major Infractions will be sent home for the day. The Company will review what happened and provide a written assessment both of the action and the resulting discipline. Severe and/or repeat infractions will result in the termination of employment.

Major Infractions

. . .

• Unauthorized disclosure of confidential information. Confidential information includes information about wages, benefits, other terms and conditions of employment, and the identities of employee [sic].

(GC Exh. 9, p. 45.)

There does not appear to be any dispute that Respondent never disciplined an employee for violating any of these specific prohibitions.[7]

*June Conversation Between Seth Young and Gonzalez*

On around June 1, following a company meeting with employees, Gonzalez, who had recently returned to work, asked Seth Young, "Why did the Union walk away?" Young replied that they didn't have enough votes, so they basically walked away. Gonzalez also asked him what would happen if employees started talking about the Union again. (Tr. 278-280.) Young told him "that nobody was allowed to talk about the Union during working hours, and if they did so they have to do so in [sic] their own time." (Tr. 280.) There were no other employees present for this conversation.[8]

George, Gonzalez, and Andrew Rodriguez each testified that Respondent regularly allowed employees to talk to one another during working hours about non-work matters, such as sports, family, weekend plans, weather, and life in general. Each confirmed there were no limits placed on what employees could talk about. (Tr. 114–115; 234–235; 280–281.)

Employees may not distribute literature in working areas or during working time. This means that you may not, in areas where you or others work, or during times when you are working, pass out, post, or leave lying about, literature advertising or supporting any venture, activity or cause. Employees may not solicit other employees during their own working time or the other employee's working time. These types of conversations must be limited to times when both you and the person or persons that you are speaking with are not working. Non-employees may not solicit or distribute literature on property of the Company at any time.

(GC Exh. 9, p. 43.)

Young testified that Respondent has never disciplined an employee for violating the no-solicitation policy or for talking about the Union during working time. (Tr. 487.)

14                         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*Late September or Early October Conversation Between Seth Young and Gonzalez*

In late September or early October, the police were called to Respondent's facility. Gonzalez saw Seth Young standing outside between Building 1 and Building 2 and asked him why the police were there. Young told him that Nick Garcia, a recently discharged employee, came onto the property, got into an argument, and refused to leave. Gonzalez then jokingly asked Young if he wanted him to go and kick Garcia's ass. (Tr. 322–323.) During this conversation, Young also mentioned Mike Marengo, another former employee, who had been involved in starting the 2018 Union organizing campaign. Young told Gonzalez those employees "didn't need to come around the premises if they wasn't working there no more. That he [Marengo] needed to grow up." Gonzalez then asked Young "about the guys that they wasn't working there anymore, why, why they didn't bring them back?" Young replied that he "couldn't trust them" and anybody that "couldn't be trusted, talking about the Union, he said he'll destroy them." (Tr. 284.) There were no other employees present for this conversation.[9]

*October 2020 Organizing Activities*

In late September or early October, Gonzalez, Kyle George, Joseph Soto, and Keon Smith began speaking to one another about Respondent's unequal enforcement of its new work rules. (Tr. 78-79, 173-175, 286.) One of the employees that they discussed was Matthew Mintz, a machine operator, who was cousins with Seth and Max Young. Gonzalez complained about how everyone except Mintz was subject to Respondent's new rules. He specifically mentioned the policy against cell phone usage, and how management allowed Mintz to text and call on his phone all day long. (Tr. 286.) There also was discussion about reaching out to the Union.

In early October 2020, George contacted Mike Marengo about restarting the Union organizing effort. Marengo met with George on October 10 and gave him authorization cards to hand out. Later that day, George spoke with Gonzalez. They both signed cards and planned to distribute the rest to other employees before work and on break on October 19. (Tr. 81, 288.)

On October 19, starting at around 6:30 a.m., George and Gonzalez were standing in the parking lot outside of the Respondent's facility. They handed out authorization cards to a few of the employees prior to their 7 a.m. start time. They then went in and began work at 7 a.m. George testified he gave cards to five employees, including Soto, Smith, and Andrew Rodriguez. (Tr. 82.)

At some point prior to October 19, George accepted a job offer with Metalwest, a customer of Respondent. The offer was subject to George passing a pre-employment drug screening. On October 19, at 7:27 a.m., the plant manager for Metalwest texted George asking if he had given Respondent notice that he was resigning. (GC Exh. 18.) At 7:31 a.m., George responded he was going to give his notice that day. Between 7:32 a.m. and 8:30 a.m., Respondent's Plant Manager Chuck Hahn approached George and asked if he was leaving. George said that he was and gave his two-week notice.[10] After the conversation ended, Hahn told George to write an operating manual for the Demis machine that George worked on. George testified that writing the manual would take more than one day to complete. Later that morning, Respondent's Chief Financial Officer Bob Carter asked George if it was true that he was starting a new job. George said that he was, and Carter wished him good luck. (Tr. 92–93; 444–445.)

Around 9:30 a.m., George took his scheduled morning break. He and several other employees drove to the local corner store about a half-mile from the facility. There, George distributed a few more authorization cards to employees. Andrew Rodriguez returned his signed authorization card to George outside of the store. Matthew Mintz was also present at the store that morning.[11]

Starting around 10:15 a.m., Union representative Robert Gadsby used the contact list he had from the 2018 election to send text messages to several of Respondent's employees. (Tr. 402.) The text said "Would you like to see Local 19 back at your workplace? Are you tired of not having a voice? Are you tired of threats? We would like a chance to REPRESENT YOU! Please click the link and fill out a new digital authorization card today!" (GC Exhs. 19, 21, 26.)

Later that morning, Joseph Soto observed employee John Conway tell Hahn, "Look, the Union sent out text messages [with] authorization cards." He then showed Hahn the text on his cell phone. According to Soto, Hahn became "pale as a ghost" and then walked toward Respondent's office. (Tr. 182.) Rodriguez also saw employee Christian Albino show Matthew Mintz the text he received from the Union. Rodriguez saw Mintz then make a phone call, but he did not hear what was said. (Tr. 292–293.)[12]

Gadsby testified that by October 19 the Union had around eight signed authorization cards. That included cards from

---

[9]  As Respondent's designated representative, Young was present throughout the hearing, including during Gonzalez' testimony about this conversation. On direct examination, Respondent's counsel asked Young, generally, whether he had any conversations in September or October with any employees concerning union activity, and Young replied he had not. (Tr. 487.) On cross-examination, Young was specifically asked about Gonzalez' offer to kick Garcia's ass, and he testified he responded to Gonzalez that he does not condone violence. (Tr. 536–537.) Young did not respond to or refute any other portion of Gonzalez' testimony regarding that conversation. Under the circumstances, I credit Gonzalez' specific and detailed testimony about the conversation over Young's general denial.

[10]  George testified he planned to wait until after he passed his pre-employment drug screen before giving Respondent his two-weeks'

notice, just to make sure there were no issues with him starting the new job. But once Hahn asked if he was leaving, George felt he had no choice but to give his notice at that time. Metalwest later rescinded its offer to George because of a reduction in business, but the record does not reflect when that occurred.

[11]  Mintz was not called to testify.

[12]  Seth Young testified he had "zero knowledge" the Union had texted digital authorization cards to employees on October 19, stating that he first learned about it at the hearing. (Tr. 520.) I do not credit Young. It is inconceivable that Plant Manager Hahn did not notify Young on October 19 that the Union was circulating cards to organize. See, e.g., *Dobbs International Services*, 335 NLRB 972, 973 (2001) and *State Plaza, Inc.*, 347 NLRB 755, 756 (2006).

George, Gonzalez, Rodriguez, Soto, and Smith.[13] (Tr. 404–405.)

### Separation of George

At about 3:00 p.m., Shipping and Receiving Manager Joe Wilson and Max Young approached George's machine while he was working. Young told George to shut down the machine and to leave the property immediately. Young then told Wilson to escort George out of the facility. Wilson accompanied George as he gathered his belongings from his locker. While they were walking out of the breakroom, Wilson said to George, "You know what this is for, right?" George said, "Yes." Wilson said, "Somebody said that you were handing out cards." George responded, "They weren't wrong." George then walked out of the facility and drove off in his car. (Tr. 107.) No other employees were present for this conversation.[14]

Seth Young testified he accepted George's resignation on October 19, rather than allowing him to continue working for another two weeks, because George was involved in an incident several weeks earlier that caused Young to lose all faith and trust in George. In around September, George and assistant plant manager Daniel Grainer were assigned a large plate polishing job from a customer in Springfield, Missouri (Ken-Mac). Grainer started the project, and George finished it. The customer later complained to Respondent that the project was not done within specifications and demanded that it be redone. Seth Young agreed to redo the project, at Respondent's expense, which he estimated to be about $250,000. According to Young, this was the worst claim in company history. (Tr. 517.)

On around October 1, Seth Young confronted Grainer and George, and they both admitted they had not followed the order specifications and not performed the necessary measurements. Young immediately suspended Grainer for two weeks without pay and demoted him from assistant plant manager to operator. He warned George that if he ever "fucked up like this again" he would be fired. (Tr. 110.)[15]

Young testified he did not take further action against George at the time because he did not fully understand the scope of the incident.[16] And, with Grainer's suspension, Respondent had no one else available to operate the machine needed to redo the order. Young testified that by October 19 he had a better understanding as to the scope of the incident, and there was another, unidentified employee who had been trained on how to operate the machine.[17] Young explained that at that point, because he "had no trust or faith in Kyle, his ethics, his honesty, or his willingness to follow procedures over the next two weeks … it was [his] opinion to decline [George's notice] and to cut bait immediately." (Tr. 483–484.)[18]

### Layoffs of Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable

Starting at around 3 p.m., Max Young and Plant Manager Joe Wilson met individually with Soto, Rodriguez, Smith, and another employee, Bernard Venable, to inform them they were being laid off.[19] Each was given an identical letter, stating, in relevant part:

> As you know, business at Amerinox has been drastically reduced due to Covid. We have had to shut down processing lines and the entire 2nd shift. In addition, we have no visibility as to when business will return.

> It is with deep regret that we have to lay you off effective October 20, 2020.

(GC Exhs. 11-14).

Young and Wilson informed Rodriguez at about 3 p.m. that he was being laid off. Wilson then escorted Rodriguez out of the facility. At the time, Rodriguez was operating a crane and moving coils, with more coils left to move. Another employee was

---

[13] The authorization cards for George, Soto, and Gonzalez were all dated October 10. (GC Exhs. 17, 20, and 23.) Smith's card was dated October 13. (GC Exh. 24.) Rodriguez' card was dated October 19. (GC Exh. 25.).

[14] Respondent did not call Max Young or Joe Wilson to testify  As stated, both Young and Wilson are admitted supervisors and agents of Respondent.  The Board has agreed that "when a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge." *International Automated Machines*, 285 NLRB 1122, 1123 (1987), enfd. 861 F.2d (6th Cir. 1988). This is particularly true where the witness is the Respondent's agent. *Roosevelt Memorial Medical Center*, 348 NLRB 1016, 1022 (2006). Moreover, an adverse inference is warranted by the unexpected failure of a witness to testify regarding a factual issue upon which the witness would likely have knowledge. See *Martin Luther King, Sr., Nursing Center*, 231 NLRB 15, 15 fn. 1 (1977) (adverse inference appropriate where no explanation as to why supervisors did not testify); *Flexsteel Industries*, 316 NLRB 745, 758 (1995) (failure to examine a favorable witness regarding factual issue upon which that witness would likely have knowledge gives rise to the "strongest possible adverse inference" regarding such fact). Under the circumstances, I draw adverse inferences from Respondent's failure to call Young or Wilson as witnesses.  I separately credit George's testimony about these exchanges, as it was clear, consistent, logical, and, as stated, unrebutted.

[15] Young testified George admitted to not measuring the roughness of the material and filling in the orders with random numbers, and this admission caused Young to lose all faith in George. (Tr. 483.) The record does not reflect when this conversation occurred, whether it was on October 1 or some time thereafter.

[16] Young testified it took him several weeks to fully understand the extent of the errors. On October 12, he drove to Missouri to inspect the materials and the work performed firsthand. (Tr. 513-515.)

[17] Respondent asked George to help train this unidentified employee on how to operate the Demis machine.

[18] The record does not reflect what, if any, additional information Young received between the October 1 meeting and October 19. George testified Young told Grainer that Respondent had matched up the order numbers with what they had each run on the order, and Grainer had done two-thirds of the work. (Tr. 111.) However, Young testified that during his initial analysis of the order he determined Grainer was no more responsible than George, and the customer order showed that the work was split fairly even between them. (Tr. 517-518.)  I credit George on this issue because it is more logical that Young determined George to be primarily responsible considering he was the only one disciplined, and George was assigned to redo the order. Also, the record does not reflect whether Respondent implemented any safeguards or oversight to ensure that George redid the order correctly.

[19] Venable was not called to testify.

16                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

brought in to finish the job, even though Rodriguez was sched-uled to work until 5:30. (Tr. 230, 246–248.)

Young and Wilson then informed Soto he was being laid off.[20] Wilson told Miguel Gonzalez to take over operating Soto's ma-chine. Later, Chris Fagan, Respondent's Vice President of Sales and Marketing, walked over to Soto and Gonzalez, who were standing at Soto's machine, and asked, "Why are you guys standing around and the machines are not running?" Soto told him he had been laid off and showed him the letter Young gave him. According to Soto and Gonzalez, Fagan appeared surprised and shocked, read the letter, and handed it back to Soto. (Tr. 187–189; 296–297.) Fagan then placed a call and walked off towards Gonzalez's office.[21]

Smith, who was a few feet away, also witnessed this interac-tion between Fagan and Soto. He confirmed Fagan looked shocked by the layoff letter. Young also informed Smith at about 4:20 p.m. that he was being laid off. (Tr. 361–362.)

Respondent argues the October 19 layoffs were the result of sustained losses the company experienced due to the COVID-19 pandemic. Respondent introduced an income statement, pre-pared for the hearing by Chief Financial Officer Bob Carter, which sets forth Respondent's monthly revenue, cost of sales, earnings before interest, taxes and depreciation (EBITD), and earnings. (R. Exh. 54.) It shows Respondent suffered net losses of $67,111 in March, $195,799 in April, $163,806 in May, $3,988 in June, $163,060 in July, $134,343 in August, $16,571 in September, and $173,367 in October, for a total of $918,045. Carter also prepared a customer invoice report with the monthly gross volume in tons and revenue per customer, showing a steady decline in the amount of metal Respondent processed for cus-tomers from March to October. (R. Exh. 52.) Carter testified that in October, Respondent experienced its lowest production numbers, and the total revenues in tons went down between 25 to 45 percent from the prior year. (Tr. 435–436, 448–449.)

Seth Young testified the decisions to lay off Rodriguez, Soto, Smith, and Venable were all made on October 19:

> Q. Was a decision made that layoffs needed to occur all at once?
> A. At a point in time, yes.
> Q. What was that point in time?
> A. That point in time was when Kyle George resigned.

Q. So the decision was made that day?
A. Yes.
Q. On October 19th?
A. Yes, to effectuate the layoffs.
Q. So until Kyle said that to Mr. Hahn, that he was going to leave, you hadn't decided that the layoffs were going to happen that day?
A. It had not been decided, no.

(Tr. 519–520.)[22]

In determining who to layoff, Young testified that Respondent followed essentially the same procedure it used for the June layoffs, focusing on the employee's performance, attendance, and their ability to follow standard operating procedures, take instruction, and work well with others. (Tr. 466.) According to Young, his son, Max, prepared a memo identifying potential indi-viduals for layoff. Unlike the memo prepared for the earlier layoffs, this memo was undated. (R. Exh. 48.)[23] The memo listed Rodriguez, Soto, Smith, Venable, George, and two others as potential candidates.[24] Young testified he, Max Young, Bob Carter, and Chris Fagan were involved in general discussions about the layoffs.[25]

After October 19, Respondent was left with around 28 em-ployees. (GC Exh. 7.) In September, employees worked a total of 55 hours of overtime. In October, overtime jumped to 482.75 hours. In November, it increased to 509.25 hours. In December, it doubled to 1058 hours. (GC Exh. 8.) Respondent also started hiring new employees in January 2021. Since January 2021, Re-spondent has hired eleven new employees. (GC Exh. 7.) To date, none of the four employees laid off in October have been re-called.

### Discharge of Miguel Gonzalez

On October 15, Miguel Gonzalez was assigned to work with Matthew Mintz. Gonzalez told Plant Manager Chuck Hahn he did not want to work with Mintz because they always got into arguments whenever they worked together, but Hahn did not change the assignment. During the shift, Mintz told Gonzalez that he smelled and called him a "bitch." The two began arguing and Gonzalez told Mintz, "Let's take it outside." Mintz re-sponded that he would destroy Gonzalez if they went outside.

---

[20] About a month prior to his layoff, Max Young told Soto that Re-spondent was losing $50,000 a month, but Respondent did not want to lay anyone off because they knew how hard it was and people were strug-gling. (Tr. 198-201, 212-213.) I credit Soto's testimony as it was clear and consistent on both direct and cross examination and, once again, his testimony was unrefuted. (Tr. 198-201, 212-213.)

[21] Fagan was not called to testify.

[22] Young never explained how George's resignation prompted the layoffs the other four employees.

[23] Initially, Seth Young could not recall if his son prepared a memo regarding the October 19 layoffs. It was only after Respondent's counsel showed him the document and asked if it was the memo Max Young prepared for those layoffs that he could identify it. (Tr. 467.) The un-dated memo begins by stating it was confirming management's discus-sions about the layoffs to occur during the week of October 19, which Seth Young testified he received some time prior to October 19. He also

testified he, Carter, Fagan, and Max Young had general discussions about the layoffs. (Tr. 467-468.) However, he failed to explain how he could have received a memo and had discussions about the layoffs prior to October 19 when they did not decide about the layoffs until *after* George notified Respondent on October 19 that he was resigning in two weeks. Under these circumstances, I give no weight to the memo as I find its creation to be highly suspect. I also do not credit Young's unre-liable testimony.

[24] Respondent did not introduce evidence on how and why it selected the individuals it did (and did not) from this list.

[25] Carter was Respondent's only other witness. He was not questioned about these alleged discussions. Where Respondent's failure to question its own witness about a significant matter cannot be attributed to mistake or omission, an adverse inference is warranted. *Advanced Installations*, 257 NLRB 845, 849 (1981); *Colorflo Decorator Products*, 228 NLRB 408, 410 (1977).

(Tr. 303.)[26]  Hahn came over and told Gonzalez to work with Kyle George on another line.  Gonzalez then went over to begin working with George.

Later, Assistant Plant Manager Stacy Schmidt told Gonzalez that he was being sent home for the day.  After leaving the building, Gonzalez called Max Young and asked why he was being sent home.  Young told him because he had threatened Mintz.  Gonzalez told Young that he told Mintz to "step outside and talk" because it was loud in the building.  When Young said there would be an investigation, Gonzalez offered Ramon and Christian Albino as witnesses.  Gonzalez also told Young that this was not the first time that Mintz had harassed him, and that he wanted to file a harassment complaint against Mintz the next day, October 16, which was Gonzalez' day off.  Young told him they could address the matter on Monday, October 19, when Gonzalez was next scheduled to work.

On Friday, October 16, Gonzalez called Max Young and again told him that he wanted to file a complaint or grievance against Mintz for harassment.  Young said it wasn't necessary, and he would still investigate what happened.  Gonzalez said that he wanted Mintz to have equal punishment.  Young said he had to conduct his investigation before taking any action.

When Gonzalez returned to work on Monday, October 19, he tried to meet with Young to discuss his harassment complaint against Mintz.  He texted Young asking when he had time to see him.  Young called Gonzalez and told him that they would meet at 3:30 p.m. (Tr. 309–310.)

At around 3 p.m., Young called Keon Smith and Christian Albino to the office to provide a written statement about what they observed between Gonzalez and Mintz on October 15.  Smith wrote he heard Gonzalez say to Mintz, "Let's take this outside."  He wrote he did not hear Mintz say anything to Gonzalez.  Albino wrote Gonzalez was not working so Young told him to get back to work.  The two then started arguing, but Albino did not hear what was said.  (GC Exh. 10.)  [Smith was laid off about an hour after he provided his statement to Young.]

At 3:30 p.m. Gonzalez went to meet with Max Young at his office, but Young was not there.  He saw both Max and Seth Young in Seth Young's office.  When they saw Gonzalez, they closed the door to the office.  Afterwards, Gonzalez noticed that Max Young had texted him cancelling their scheduled meeting, stating that something had come up. (GC Exh. 22.)

Within the hour, Max Young told Gonzalez he was terminated and needed to leave the facility immediately.[27]  No reason was given at the time.  Joe Wilson then escorted Gonzalez out of the facility.  About an hour later, Gonzalez sent Young a text message asking why he was terminated since he had not been given a reason.  He did not receive a response.  A few days later, Gonzalez received a letter stating he had been discharged for physically threatening Mintz with violence on October 15. (GC Exh.

10(a).)[28]

The record reflects Respondent has disciplined others for threats or acts of violence.  In January, an employee grabbed another employee by the back and proceeded to "grind" and "hump" on him in a sexual way.  The employee complained and management sent the offending employee home for the day and gave him a written warning for unwanted physical touching. (GC Exh. 16, 28.)  In mid-July, another employee was suspended for two days for an "act of violence" after he threw a lock during a disagreement with another employee, hitting and ruining a nearby sheet of customer material. (GC Exh. 15.)

In August 2018, Respondent terminated a probationary employee whose work was not up to standards and that employee told another employee the he "wanted to shoot someone." (GC Exh 29.)  In October 2019, Respondent terminated an employee who physically threatened another employee and "got in the face" of two others until a manager was called. (GC Exh. 30.)  That employee also punched another employee in the face. (Tr. 494–495.)

<center>ANALYSIS</center>

<center>*A.  Seth Young's 8(a)(1) Statements to Gonzalez*</center>

The Acting General Counsel alleges that Respondent's President Seth Young violated Section 8(a)(1) of the Act on around June 1, when he told Miguel Gonzalez following an employee meeting that employees were not permitted to talk about the Union during working time, even though Respondent permitted employees to talk about other non-work topics during working time.  Multiple witnesses testified that Respondent permitted employees to talk about non-work topics during working time, without any limitation.  For example, they would talk about sports, the weather, their families, their weekend plans, as well as other topics.  The Board has consistently held that an employer violates Section 8(a)(1) when it permits employees to discuss non-work-related subjects during working time but prohibits them from discussing union-related matters  See generally, *BMW Mfg. Co.*, 370 NLRB No. 56, slip op. at 1–2 (2020); *Orchids Paper Products Co.*, 367 NLRB No. 33, slip op. at 2 fn. 8 (2018); *Jensen Enterprises*, 339 NLRB 877, 878 (2003); see also *Frazier Industrial Co.*, 328 NLRB 717, 717 (1999).

Young did not deny making the statement, or that employees were permitted to discuss non-work-related topics during working time.  Respondent, instead, relies upon *Wynn Las Vegas, LLC*, 369 NLRB No. 91 (2020), in which the Board upheld a casino's discipline of a security guard caught on video encouraging another employee to vote for the union during work time, in violation of the casino's no-solicitation policy.  In reaching this conclusion, the Board redefined "solicitation" to encompass "the act of encouraging employees to vote for or against union

---

[26] Gonzalez testified he asked Mintz to "go outside and talk" because it was loud in the building at the time.  I do not credit Gonzalez on this point.  Kyle George and Keon Smith confirmed hearing Gonzalez say, "Let's take it outside."  Also, Gonzalez had no difficulty hearing because he was able to testify, in detail, about their conversation.

[27] For the same reasons previously stated, I make an adverse inference based on Respondent's failure to present Max Young as a witness to testify about his investigation and the decision to discharge Gonzalez.

[28] Gonzalez' termination letter states Max Young told Gonzalez, "since you just admitted to threatening Matthew [Mintz] with physical violence, you need to clock out and go home for the day while I conduct an investigation." (GC Exh. 10(a)).  Although I have not credited Gonzalez' testimony about what he specifically said to Mintz, I do credit he never admitted to Young that he had threatened physical violence.

18                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

representation" because the employee is selling or promoting the services of the union (or urging employees to reject those services), and held that employees may be disciplined for such conduct pursuant to a "validly enacted and applied no-solicitation policy." Id. slip op. at 4–5. Respondent's argument, however, fails to recognize that Gonzalez' question, and Young's response, was not about solicitation; it was about talking. *Wynn Las Vegas* did nothing to alter longstanding precedent prohibiting an employer from restricting its employees from talking about union-related matters during work time if it allows them to talk about other non-work-related matters during work time. Id. slip op. at 11. Under the circumstances, I find Young's statement to Gonzalez that employees were not permitted to talk about the Union during working time violated Section 8(a)(1).

The Acting General Counsel next alleges that Seth Young violated Section 8(a)(1) in late September or early October 2020, when he threatened employees with discharge if they supported the Union or engaged in Union activity. This allegation relates to his conversation with Gonzalez when the police were called to Respondent's facility. Young informed Gonzalez the police had been called because Nick Garcia, a former employee, had come to the facility and refused to leave. Young referred to Garcia and Michael Marengo, both supporters of the Union who were discharged, stating he "couldn't trust them" and anybody that he felt "couldn't be trusted, talking about the Union, he said he'll destroy them." An employer's statement equating union activity with disloyalty or the loss of trust violates the Act. See *A.S.V. Inc. a/k/a Terex*, 366 NLRB No. 162, slip op. at 26 (2018). Additionally, threats of adverse action for engaging in union activities, whether explicit or implicit, violate Section 8(a)(1). *Boar's Head Provisions Co.,* 370 NLRB No. 124, slip op. at 16 (2021), and cases cited therein. As stated, Young generally denied threatening anyone between September and October for engaging in union activities or supporting the Union. He did not address this specific conversation with Gonzalez, other than his response when Gonzalez jokingly offered to go and kick Garcia's ass. As stated, I have credited Gonzalez over Young regarding this conversation. The sentiment Young expressed is similar to his earlier statements and implied threats during the April 25, 2019 meeting about the formal settlement, stating: "You know how we stand up against evil as a team. We don't let anybody shit in our house" and "Don't get sucked into the nonsense. Don't let anybody instigate a problem where you'll be in trouble." Under these circumstances, I find that Young's statement that he would destroy those who supported the Union violated Section 8(a)(1).

### B. Joe Wilson's 8(a)(1) Statements to George

The Acting General Counsel alleges that on October 19, Shipping and Receiving Manager Joe Wilson violated Section 8(a)(1) when he (i) told George he was being discharged because of his support for the Union; and (ii) created the impression that employees' union activities were under surveillance by stating he was aware that George had distributed authorization cards for the

Union. It is unlawful for an employer to tell or suggest to an employee that they were being discharged or disciplined because they supported or assisted a union. See *Extreme Building Services Corp.,* 349 NLRB 914, 914 fn. 3, 929 (2007); and *Watts Electric Corp.,* 323 NLRB 734, 735 (1997), revd. in part, vacated in part mem. 166 F.3d 351 (11th Cir. 1998). It is also unlawful for an employer to create the impression that an employee's union activities are being surveilled. The test of whether an employer has created the impression of surveillance is an objective one, that is, whether under all the circumstances an employee could reasonably conclude from the statement or conduct in question that his/her union activities had been placed under surveillance. *Bridgestone Firestone South Carolina,* 350 NLRB 526, 527 (2007), quoting *Flexsteel Industries,* 311 NLRB 257, 257 (1993). See also *Consolidated Communications of Texas Co.,* 366 NLRB No. 172, slip op. at 1 fn. 1 (2018). Thus, when an employer tells employees that it is aware of their protected activities, but fails to identify the source of this information, an unlawful impression of surveillance is created because employees could reasonably surmise that employer monitoring has occurred. *Charter Communications, LLC,* 366 NLRB No. 46, slip op. at 4-5 (2018).

As stated, I have credited that Wilson told George he was being escorted off the property and not allowed to work his final two weeks because he had been seen distributing Union authorization cards. This statement reasonably creates an impression that George's union activities had been placed under surveillance, and that he was being removed and barred from working because of those union activities. Accordingly, I conclude Wilson's statements violated Section 8(a)(1).

### C. Section 8(a)(3) and (1) Separation of Kyle George and Discharge of Miguel Gonzalez

#### 1. Legal Framework

The Acting General Counsel next alleges that on about October 19, 2020, Respondent discharged its employees Kyle George and Miguel "Taz" Gonzalez because they formed, joined, or assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities, in violation of Section 8(a)(3) and (1) of the Act. Section 8(a)(3) makes it an unfair labor practice to discriminate regarding the hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.[29] The legal standard for evaluating whether an adverse employment action violates Section 8(a)(3) of the Act is set forth in *Wright Line,* 251 NLRB 1083, 1089 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982). To sustain a finding of discrimination, the General Counsel must make an initial showing that the employee's union or other protected activity was a motivating factor (in whole or in part) in the employer's adverse employment decision. The elements required to support such a showing are union or protected concerted activity by the employee, employer knowledge or suspicion of that activity, and animus on the part of the employer. *Electrolux Home Products,*

---

[29] The Board has held that a violation of Sec. 8(a)(3) is also a derivative violation of Sec. 8(a)(1). *Bemis Co.,* 370 NLRB No. 7, slip op. at 1 fn. 3 (2020).

368 NLRB No. 34, slip op. at 2-3 (2019). Proof of discriminatory motivation (animus) can be based on direct evidence or can be inferred from circumstantial evidence based on the whole record. Circumstantial evidence of discriminatory motivation may include evidence of: suspicious timing; false or shifting reasons provided for the adverse employment action; failure to conduct a meaningful investigation of alleged employee misconduct; departures from past practices; tolerance of similar behavior for which the employee was allegedly removed; and/or disparate treatment of the employee. See *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. at 4, 8 (2019); *Medic One, Inc.*, 331 NLRB 464, 475 (2000). The evidence must be sufficient to establish a causal relationship between the employee's protected activity and the employer's adverse action. *Tschiggfrie*, supra, slip op. at 8.

If the Acting General Counsel makes this initial showing, the burden shifts to the employer to demonstrate by a preponderance of the evidence that the same action would have taken place even in the absence of the protected conduct. See *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 26–27 (2018), and cases cited therein. The employer cannot meet its burden merely by showing it had a legitimate reason for its action; rather, it must show it would have taken the same action in the absence of the protected conduct. See *Bruce Packing Co.*, 357 NLRB 1084, 1086-1087 (2011), enfd. in pertinent part 795 F.3d 18 (D.C. Cir. 2015). The Acting General Counsel may also offer proof that the employer's reasons for the personnel decision were false or pretextual. *Con-Way Freight, Inc.*, 366 NLRB No. 183, slip op. at 2–3 (2018). When the employer's stated reasons for its decision are found to be pretextual --- that is, either false or not in fact relied upon --- discriminatory motive may be inferred. *Electrolux*, supra slip op. at 3.

### 2. Kyle George

In applying these factors, I find the Acting General Counsel has met his burden of establishing that George's distribution of authorization cards to restart the organizing campaign was a motivating factor in Respondent's decision to remove him on October 19, rather than allow him to work his final two weeks after giving notice that he was resigning. Wilson's statements to George as he escorted him off the property are direct evidence of knowledge and animus. Even without those statements, the timing of George's removal in relation to when he distributed authorization cards, without any intervening event, is sufficient to infer knowledge and animus. See generally, *Gaetano & Associates, Inc.*, 344 NLRB 531, 532 (2005); *Davey Roofing, Inc.*, 341 NLRB 222, 223 (2004). See also *Manor Care Health Services--Easton*, 356 NLRB 202, 204, 226 (2010); *La Gloria Oil & Gas Co.*, 337 NLRB 1120, 1123, 1132 (2002), enfd. 71 Fed. Appx. 441 (5th Cir. 2003). Cf. *Lou's Transport, Inc.*, 361 NLRB 1446, 1458 (2014), enfd. 644 Fed. Appx. 690 (6th Cir. 2016); *Rockwell Mining LLC*, 367 NLRB No. 39, slip op. at 10 (2018).

Respondent defends that it would have taken the same action against George, regardless of his union activity, because Seth Young "had no trust or faith" in "his ethics, his honesty, or his willingness to follow procedures" based on his "gross neglect" while working on the Ken-Mac order. Young testified he determined early on that Grainer and George were both responsible

for the errors on this order, but he took no action against George, beyond admonishing him.

Young offered two explanations for taking no action at the time. First, he did not know the full extent of the errors until after he travelled to Missouri on October 12 and saw the work firsthand. That begs the question: how did Young have enough information to suspend and demote Grainer, but not enough information to discipline George? Respondent offered no explanation for this disparate treatment. Young also failed to explain what, if any, additional information he gathered between October 1 and 19 that led him to suddenly conclude on October 19 that George could no longer be trusted to work and had to be removed immediately.

Second, Young claims he needed George to fix the Ken-Mac order because there was no one else available to run the Demis machine. Young failed explain how he had enough trust in George to begin redoing the order, to train another operator on how to run the Demis machine, and to prepare an operator manual, but not enough trust on October 19 to let him work his final two weeks, or even the remainder of his last shift. I am persuaded by the Acting General Counsel's argument that allowing George to redo the order, which he admittedly helped bungle at a significant cost to Respondent, without ever disciplining him, demonstrates that Respondent trusted him—up until it learned he was restarting the organizing campaign.

Respondent also points to George's disciplinary history as part of the reason why it decided to accept his resignation immediately. George received multiple disciplines during his employment, mostly for attendance, but also for failing to follow company policy. Also, Respondent discharged George in 2018, after he was caught using cocaine while at work, but Respondent rehired him and gave him a second chance. George, however, continued to receive discipline, including in 2020. The Acting General Counsel argues, and I am convinced, that George's prior discipline and discharge (and subsequent rehiring) and subsequent discipline only prove how tolerant Respondent was of him and his shortcomings, again, up until it learned of his union activities. The Board has held that conduct previously tolerated or minimally disciplined that is later relied upon to support an adverse action, after learning of the employee's protected activity, is strong evidence of unlawful motive. See generally, *ODS Chauffeured Transportation*, 367 NLRB No. 87, slip op. at 17 (2019); *Air Flow Equipment, Inc.*, 340 NLRB 415, 418 (2003); and *Gravure Packaging, Inc.*, 321 NLRB 1296 (1996). Cf. *Vulcan Basement Waterproofing of Illinois, Inc. v. NLRB*, 219 F. 3d 677, 689-690 (7th Cir. 2000).

Overall, I reject the reasons Respondent gave for needing to remove George immediately as pretextual. Even if they were not, Respondent has presented no credible evidence establishing it would have taken the same action in the absence of George's statutorily protected activities.

I, therefore, find Respondent violated Section 8(a)(3) and (1) by removing George and not allowing him to work his final two weeks because of his union activities, and to discourage other employees from supporting the Union.

### 3. Miguel "Taz" Gonzalez

The same largely holds true regarding Respondent's decision

20                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

to discharge Gonzalez. Like George, Gonzalez distributed authorization cards and talked to employees about the Union in Respondent's parking lot on the morning of October 19. However, unlike George, no member of management admitted knowing that Gonzalez was engaging in these activities. The Board, however, has held that employer knowledge may be proven by circumstantial evidence from which a reasonable inference may be drawn. Those circumstances may include proof of knowledge of general union activity, the employer's demonstrated animus, the timing of the discharge, and the pretextual reasons asserted for the discharge. *T.K. Harvin & Sons*, 316 NLRB 510, 527–528 (1995). To satisfy the knowledge element, it is enough to show that the Respondent suspected or believed that the employee engaged in protected conduct—it is not necessary to prove actual knowledge. See, e.g., *Kajima Engineering & Construction*, 331 NLRB 1604, 1604 (2000). In addition, the Board may infer knowledge when the employee at issue is closely associated with a known union supporter, and they are separated/discharged close in time to one another. See id. See also *Diesel Truck Driver Training School, Inc.*, 311 NLRB 963 (1993) (citing to *Active Transportation*, 296 NLRB 431, 432 fn. 6 (1989)). Here, Respondent generally knew employees were distributing authorization cards on October 19, before any of the adverse actions were taken, and Wilson's statements to George, as well as Young's previous statements to Gonzalez in June and in late September or early October, demonstrate Respondent's anti-Union animus. This evidence, combined with the timing of Gonzalez' discharge within an hour or two after removing Gonzalez' union activities at the time of his discharge.

Respondent argues it discharged Gonzalez because he threatened Matthew Mintz with physical violence on October 15. The Acting General Counsel argues this is pretext, particularly considering the timing. According to Gonzalez' termination letter dated October 20, on October 15, Max Young told Gonzalez, "since you just admitted to threatening Matthew [Mintz] with physical violence, you need to clock out and go home for the day while I conduct an investigation." As the Acting General Counsel correctly notes, Respondent failed to explain, if it truly considered this type of "threat" to be a dischargeable event: (1) why Gonzalez was not discharged at the time he allegedly "admitted" to it on October 15; (2) why Gonzalez was permitted to return to work on October 19 for almost the entire day before being discharged; and (3) why Respondent did not take statements from the two witnesses (Smith and Albino) until the end of the day on October 19, well after Respondent learned of the revived Union organizing campaign. Furthermore, Respondent failed to give Gonzalez a reason for his discharge until days later. I agree that Respondent's investigation and the timing make the discharge highly suspect. Even more suspect is that Respondent did not discharge, or take any disciplinary action against, Mintz for telling Gonzalez that he "would destroy" him if they went outside, which is a far more direct threat of physical violence than saying

"let's take this outside." Collectively, these factors strongly support that Respondent's stated reasons for discharging Gonzalez are pretext.[30]

Regardless, even if they were not pretext, I find Respondent has not established it would have discharged Gonzalez in the absence of his protected activity. Respondent has discharged two other employees for threats or acts of violence; one was a probationary employee with performance issues who stated he "wanted to shoot someone," and the other was an employee who "got in the face" of two employees and punched one of them. Two other employees—one who engaged in unwelcome touching of a coworker and a second who threw a lock at another employee and damaged property—were sent home for the day or suspended, but not discharged. I find Gonzalez' comment to be less severe than all four situations. The absence of comparable discipline for similar conduct supports finding an unlawful motive and undermines Respondent's stated defense. See *Mondalez Global, LLC*, 369 NLRB No. 46, slip op. at 4 (2020); *Alternative Entertainment, Inc.*, 363 NLRB No. 131 slip. at 10 (2016).

Based on these factors, I find Respondent violated Section 8(a)(3) and (1) by discharging Gonzalez.

### D. Section 8(a)(3) and (1) Layoff of Joseph Soto, Andrew Rodriguez, Keon Smith, and Bernard Venable

The Acting General Counsel next alleges Respondent laid off employees Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable on October 19, because Respondent's employees formed, joined, or assisted the Union and engaged in concerted activities, and to discourage employees from engaging in those activities, in violation of Section 8(a)(3) and (1) of the Act. Respondent's primary argument in response to this allegation is that the Acting General Counsel failed to establish that each of these individuals engaged in protected activity and that Respondent had knowledge of that activity. The Board recently held that "[w]here, as here, an employer is shown to have engaged in a mass discharge for the purpose of discouraging employees from engaging in union activity, or retaliating against them for such activity, the [Acting] General Counsel need not establish each employee's union activity and knowledge, or that all union adherents were laid off." *David Saxe Prods., LLC*, 370 NLRB No. 103, slip op. at 33-34 (2021) (employer unlawfully discharged eight employees, all union supporters, shortly after learning of organizing campaign) (citing to *Delchamps, Inc.*, 330 NLRB 1310, 1317 (2000) and *Weldun International, Inc.*, 321 NLRB 733, 734 (1996), enfd. mem. in part 165 F.3d 28 (6th Cir. 1998)). See also *ACTIV Industries*, 277 NLRB 356, 356 fn. 3 (1985); *Birch Run Welding & Fabricating, Inc.* 269 NLRB 756 (1984) enfd. 761 F. 2d 1175 (6th Cir. 1985). In *Birch Run*, the Board held the timing of a mass layoff strongly indicates an unlawful motive. In that case, on the morning of the layoffs, the employer's president told the employees the company wanted to avoid further layoffs despite a difficult economy. Later that morning the employer became aware of the union's organizing

---

[30] As stated, Respondent failed to call Max Young to testify, and I have taken adverse inferences based on his absence. The Board has held the unexplained failure to produce critical evidence or testimony which presumably would be favorable to an employer's claims is evidence that

further supports an inference of animus. See generally, *Medic One, Inc.*, 331 NLRB 464, 475 (2000); *Lampi LLC*, 327 NLRB 222 (1998), enf. denied 240 F.3d 931 (11th Cir. 2001); *Montgomery Ward & Co.*, 316 NLRB 1248 (1995), enfd. mem. 97 F.3d 1448 (4th Cir. 1996).

campaign. By the end of that day, the employer had laid off 13 employees including six who were suspected of pro-union sympathies. The Board found the employer's asserted economic reasons for the layoff were pretextual given the unexplained timing of the layoffs shortly after gaining knowledge of union activities. On review, the U.S. Court of Appeals for the Sixth Circuit held "[t]he rationale underlying this theory is that general retaliation by an employer against the workforce can discourage the exercise of section 7 rights just as effectively as adverse action taken against only known union supporters." *Birch Run Welding & Fabricating Inc. v. NLRB*, 761 F.2d at 1180. Thus, instead of showing a specific correlation between each discriminatee's union activity and his or her discharge, the Acting General Counsel's burden is "to establish the mass discharge was implemented to discourage union activity or in retaliation for the protected activity of some of the employees." *David Saxe*, supra, slip op. at 34 (internal citations omitted). In the present case, Respondent laid off Rodriguez, Soto, Smith, and Venable, separated George, and discharged Gonzalez, all within a few hours of learning about the authorization cards, and about a month after Max Young told Soto that even though Respondent was losing money it did not want to lay anyone off because the company knew people were struggling.

The Board also held that the "dramatic timing" of a mass discharge/layoff "hard on the heels" of an employer learning about its employees' organizing activity "strongly supports an inference of animus and discriminatory motivation." *David Saxe*, supra, slip op. at 34 (quoting *Saigon Gourmet Restaurant, Inc*., 353 NLRB 1063, 1065 (2009)). This is particularly true where, as here, Respondent's President admits that the company did not decide to lay off these individuals *until* October 19.[31]

Additionally, all the affected employees, except for Venable, signed an authorization card by October 19. According to the Union, a total of about eight cards were signed by that date. Five of them had their employment ended within a few hours of Respondent first learning about the renewed organizing campaign. As the Acting General Counsel points out, the discriminatees constituted around 18 percent (6 of about 34) of Respondent's employees, but 62.5 percent (5 out of 8) of the card signers. The Board and courts have long held that, absent a reasonable explanation, the disproportion between the number of union adherents versus other employees who suffer adverse employment actions is persuasive evidence of discrimination. *David Saxe*, supra, slip op. at 34, and cases cited therein. See e.g., *Davis Supermarkets*, Inc., 306 NLRB 426 (1992), enfd. in relevant part 2 F.3d 1162 (D.C. Cir. 1993) (six of eight laid off employees were union supporters when only 13 of more than 100 employees signed authorization cards); and *Camco, Inc*., 140 NLRB 361, 365 (1962), enfd in part 340 F.2d 803, 810 (5th Cir. 1965) (employer discharged 11 of 16 union supporters without discharging any of its other 74 employees).[32]

Respondent contends the October 19 layoffs were necessary because of its dire financial condition and the sustained losses it suffered, particularly in October. Carter presented documents he prepared showing a drop in business (based on tonnage and revenues) between March and October. However, each of the discriminatees who testified worked all or most of their scheduled hours, with occasional overtime, in the weeks prior to their layoffs. Furthermore, following the layoffs, the amount of overtime worked skyrocketed, as stated, from 55 hours in September, to 482.75 hours in October, to 509.25 hours in November, to 1058 hours in December. See *Dillingham Marine and Mfg. Co*., 239 NLRB 904, 911 (1978) (employer failed to establish layoffs were economically necessary when they caused increased overtime, holding "it is not a good business practice [when an employer is concerned about profitability] to lay off [employees] and pay the remaining workforce at more expensive overtime wage rates."). Respondent also hired 11 new employees beginning in January 2021, without recalling any of the four discriminatees who it laid off on October 19. Respondent offered no explanation for either.

Respondent also offered no explanation for why the layoffs suddenly had to occur on October 19; why most of the affected employees were not permitted to finish their shift that day, even though they had work left to do; and why at least one of the laid off employees (Rodriguez) had to be escorted out of the building after he was told of his layoff. The Board has held a strong inference of antiunion motivation is further validated where, as here, the layoffs occur in an "abrupt and slap-dash manner." *David Saxe*, 370 NLRB No. 103, slip op at 34.

Considering all the evidence, I conclude Respondent violated Section 8(a)(3) and (1) by laying off Rodriguez, Soto, Smith, and Venable because of the renewed organizing campaign, and to discourage employees from supporting the Union.

*E. Section 8(a)(1) Employee Manual Rules*

The Acting General Counsel alleges Respondent violated Section 8(a)(1) between about June 1, 2020 and about March 30, 2021, by maintaining rules in Sections L and V of its Employee Manual and its Progressive Disciplinary Policy that prohibit employees from disclosing information about wages, benefits, and other terms and conditions of employment.

The Board has held that rules and policies that prohibit employees from disclosing or discussing their wage rate or salary violate the Act. *Parexel International, LLC*, 356 NLRB 516, 518 (2011) (citing *Aroostook County Regional Ophthalmology Center*, 317 NLRB 218, 220 (1995), enfd. in part 81 F.3d 209 (D.C. Cir. 1996)) (discussions regarding wages, the core of Sec. 7 rights, are the grist on which concerted activity feeds). That remains true under the standard the Board outlined in *Boeing Co*.,

[31] Seth Young testified to having general discussions with his son, Fagan, and Carter before announcing the layoffs. But, according to several witnesses, Fagan appeared shocked when he learned from Soto about the layoffs.

[32] Although Venable did not sign a card, in the context of an organizing drive, it is a violation of Sec. 8(a)(3) and (1) to discharge a neutral employee to facilitate or cover-up discriminatory conduct against known or suspected union supporters. See *Bay Corrugated Container*, 310 NLRB 450, 451 (1993), enfd. 12 F. 3d 213 (6th Cir. 1993). The Board need not prove the employer's knowledge of union activity by the neutral employees because they were treated adversely as part of the employer's plan to discriminate against known union supporters. As with mass-layoff cases, the cover-up exception allows the Board to sanction discrimination in the form of actions and policies that sweep in neutral employees. See *Napleton 1050, Inc. v. NLRB*., 976 F.3d 30, 53 (D.C. Cir. 2020), enfg. 367 NLRB No.6 (2018). That is what occurred here.

365 NLRB No. 154 (2017), for determining whether a facially neutral work rule or policy, when reasonably interpreted, would unlawfully interfere with, restrain, or coerce employees in the exercise of their Section 7 rights. In *Boeing*, the Board established three categories of rules. Category 1 includes rules that the Board designates as lawful to maintain, either because (i) the rule, when reasonably interpreted, does not prohibit or interfere with the exercise of statutory rights; or (ii) the potential adverse impact on protected rights is outweighed by justifications associated with the rule. Category 2 included rules that warrant individual scrutiny in each case as to whether the rule would prohibit or interfere with statutory rights, and if so, whether any adverse impact on statutorily protected conduct is outweighed by legitimate justifications. Category 3 includes rules that the Board will designate as unlawful to maintain because they would prohibit or limit protected conduct, and the adverse impact on employees' statutory rights is not outweighed by justifications associated with the rule. The Board held an example of a Category 3 rule would be one that prohibits employees from discussing wages with one another. Id., slip op. at 3–4, 15.

The provisions at issue in the Employee Manual and Disciplinary Policy prohibit employees from disclosing confidential information, which, by definition, includes information about employees' wages, benefits, and other terms and conditions of employment. Such rules fall within Category 3 and are unlawful. *Heritage Lakeside*, 369 NLRB No. 54, slip op. 1 fn.9 (2020) (Board found unlawful non-disclosure policy prohibiting employees from discussing salary or wage information). See also *Lowe's Home Centers, LLC*, 368 NLRB No. 133, slip. op. 1 fn. 1 (2019) (Board found unlawful confidentiality provision covering "salary information" because the policy was directed to all employees, not just those given access to the employer's confidential customer records).

Respondent does not dispute that the provisions at issue are unlawful. Rather, it asserts the allegation should be dismissed because it has repudiated those provisions as of March 30, 2021, when it revised and reissued both documents to include acceptable language. The Acting General Counsel argues Respondent has not effectively repudiated its unlawful maintenance of these provisions in accordance with the requirements of *Passavant Memorial Area Hospital,* 237 NLRB 138 (1978). A proper repudiation must be timely, unambiguous, specific in nature to the coercive conduct, and free from other proscribed illegal conduct. *Boch Honda.*, 362 NLRB 706 fn. 3 (2015) (citing *Passavant*). The repudiation also must be adequately published to the employees involved, giving them assurances that, in the future, the employer will not interfere with the exercise of their Section 7 rights. Id. Respondent has done nothing more than revise the offending provisions and reissue its Employee Manual and Disciplinary Policy, which, alone, does not constitute effective repudiation. Id. (citing to *Lily Transportation, Corp*., 362 NLRB 406 (2015) and *Casino San Pablo*, 361 NLRB 1350, 1354 (2014)).

Accordingly, I find Respondent violated Section 8(a)(1) by maintaining the provisions at issue in its Employee Manual and

---

[33] The Acting General Counsel does not contend the revised provisions continue to violate the Act.

Disciplinary Policy, from June 1, 2020 through March 30, 2021. I further find Respondent's actions are insufficient to meet the *Passavant* repudiation requirements.[33]

CONCLUSIONS OF LAW

1. Amerinox Processing, Inc. ("Respondent") is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act from its Camden, New Jersey facility.

2. Respondent violated Section 8(a)(1) of the Act by telling employees were not permitted to talk about the Union during working time, although Respondent permitted employees to talk about other non-work topics during working time.

3. Respondent violated Section 8(a)(1) of the Act by threatening employees with discharge if they supported the Union or engaged in Union activity.

4. Respondent violated Section 8(a)(1) of the Act by (i) telling an employee that the employee was being discharged because of the employee's support for the Union; and (ii) by creating the impression among its employees that their Union activities were under surveillance by Respondent.

5. Respondent violated Section 8(a)(3) and (1) of the Act when it discharged its employee Miguel "Taz" Gonzalez because he formed, joined, or assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

6. Respondent violated Section 8(a)(3) and (1) of the Act when it immediately separated its employee Kyle George, rather than allowing him to work his final two weeks, because he formed, joined, or assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

7. Respondent violated Section 8(a)(3) and (1) of the Act when it laid off its employees Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable because Respondent's employees formed, joined, or assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

8. The unfair labor practices described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I recommend an order that it cease and desist and to take certain affirmative actions designed to effectuate the policies of the Act. Specifically, having found that the Respondent violated Section 8(a)(3) and (1) by discharging Miguel Gonzalez and laying off Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable, Respondent shall offer them full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed, and to make them whole for any loss of earnings and other benefits suffered as a result of the discrimination against them. Backpay for the above-listed employees shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with

AMERINOX PROCESSING, INC.                                                23

interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). In accordance with *King Soopers, Inc.*, 364 NLRB No. 93 (2016), enfd. in relevant part 859 F.3d 23 (D.C. Cir. 2017), Respondent shall compensate these individuals for their reasonable search-for-work and interim employment expenses regardless of whether those expenses exceed interim earnings. Search-for-work and interim employment expenses shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra. Respondent also shall compensate them for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and to file with the Regional Director for Region 4, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years for each of them. *AdvoServ of New Jersey, Inc.*, 363 NLRB 132 (2016). In addition, Respondent shall file with the Regional Director for Region 4 a copy of each employee's corresponding W-2 form(s) reflecting the backpay award.

Respondent also shall remove from its files any references to the unlawful discharge of Gonzalez and layoffs of Rodriguez, Soto, Smith, and Venable, and to notify them in writing that this has been done and that the unlawful discharge or layoff will not be used against them in any way.

Further, having found that the Respondent violated Section 8(a)(3) and (1) by removing Kyle George two weeks prior to the time his resignation would have been effective, Respondent is ordered to make him whole for losses in pay and benefits he would have earned during that two-week period in the manner prescribed in *F.W. Woolworth Co.*, supra, plus interest as set forth in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.[34]  In addition, in accordance with *AdvoServ*, supra, Respondent shall compensate George for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and to file with the Regional Director for Region 4, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year. And Respondent shall file with the Regional Director for Region 4 a copy of George's W-2 form reflecting the backpay award.

Respondent shall remove from its files any references to the unlawful removal of George, and to notify him in writing that this has been done and that the unlawful removal will not be used

against him in any way.

To the extent it has not already done so, Respondent shall rescind Section L (Performance, Behavior Expectations and Discipline) of its Employee Manual, Section V (Confidential Information/Non- Disclosure) of its Employee Manual, and Section C (Major Infractions) of its Progressive Disciplinary Policy that require employees to keep wages, benefits, and other terms and conditions of employment confidential. Also, Respondent shall, to extent it has not already done so, provide employees with inserts or revised versions for the current Employee Manual and current Progressive Disciplinary Policy that: (1) advises that the unlawful provisions have been rescinded, or (2) provides a lawfully worded provision on adhesive backing that will cover the unlawful provisions; or publish and distribute a revised Employee Manual and revised Progressive Disciplinary Policy that (1) do not contain the unlawful provisions, or (2) provide lawfully worded provisions.

In addition to these standard remedies, the Acting General Counsel seeks the following additional remedies: a Notice reading, Notice mailing, providing the Union with employees' contact information and access to Respondent's bulletin board, providing the Union with access to Respondent's facility, and a broad cease-and-desist order. In determining whether additional remedies are necessary to fully dissipate the coercive effect of unlawful discharges/layoffs and other unfair labor practices, the Board has broad discretion in fashioning a remedy to fit the circumstances of each case. *Casino San Pablo*, 361 NLRB 1350, 1354 (2014); *Excel Case Ready*, 334 NLRB 4, 4-5 (2001). In reviewing the evidence, I conclude a Notice reading and a broad cease and desist order are appropriate.

A notice reading is appropriate where the employer's violations are serious enough that a reading is warranted to dissipate the chilling effect of the violations on employees' willingness to exercise their Section 7 rights. See, e.g., *Wismettac Asian Foods, Inc.*, 370 NLRB No. 35, slip op. at 4, 53 (2020). Here, Respondent committed serious violations, including threats from the company president that he would destroy those who support the Union and later a mass separation/layoff of over 60 percent of the Union supporters immediately upon learning of the renewed organizing efforts. Moreover, based on the prior formal settlement with no non-admission clause, I find Respondent has a history of serious violations during the prior organizing effort. *Camaco Lorain Mfg. Plant*, 356 NLRB 1182, 1189 (2011)(formal settlement agreement without a non-admission clause can be used to establish a proclivity to violate the Act). Accordingly, I

---

[34] The Acting General Counsel and Union argue George was unlawfully discharged and is entitled to reinstatement with full backpay. I disagree. In *Campbell Electric Co.,* 340 NLRB 825, 826 (2003), the Board held a discriminatee who had "specific and definitive plans to resign" before he was unlawfully terminated was not entitled to reinstatement and his backpay tolled on the day of his planned departure. The Board reasoned that:

[R]emedial questions implicate two statutory principles that must be applied. The first principle is that the remedy should restore the status that would have obtained if [r]espondent had committed no unfair labor practice. The second principle is that any uncertainty and ambiguity regarding the status that would have obtained without the unlawful conduct

must be resolved against the [r]espondent, the wrongdoer who is responsible for the existence of the uncertainty and ambiguity.

Id. (citations omitted).

There is no uncertainty or ambiguity regarding George's October 19 resignation. Although he initially planned to give Respondent notice of his resignation after learning he passed the pre-employment drug screen with Metalwest and there were no other issues with him starting there, he changed his mind after Hahn approached him and asked if he was leaving. There is no dispute George then gave Hahn his two-weeks' notice. Carter left came and wished George well on his new job. George had more than "specific and definitive plans to resign;" he *had* resigned. I, therefore, conclude he is not entitled to reinstatement and his backpay is tolled at two weeks.

24                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

recommend Respondent be required to hold a mandatory em-
ployee meeting, or meetings, on working time and at times when
the Respondent customarily holds meetings, to ensure the widest
possible employee attendance, at which the Respondent's repre-
sentative(s) read aloud the Notice to employees in English and
Spanish, in the presence of a Board Agent, via ZOOM/video
conference, or in a manner and location otherwise ordered by the
Regional Director of Region 4, or at the Respondent's option,
have a Board agent read aloud the Notice via ZOOM/video con-
ference or in a manner and location otherwise ordered by the Re-
gional Director of Region 4 in the presence of a responsible Re-
spondent official.  See *Bozzuto's, Inc.*, 365 NLRB No. 146, slip
op. at 5 (2017).[35]

   In *Hickmott Foods*, 242 NLRB 1357, 1357 (1979), the Board
explained that a broad cease-and-desist order, enjoining a re-
spondent from violating the Section 7 rights of employees "in
any other manner," is warranted "when a respondent is shown to
have a proclivity to violate the Act or has engaged in such egre-
gious or widespread misconduct as to demonstrate a general dis-
regard for the employees' fundamental statutory rights." In either
situation, the Board reviews the totality of the circumstances to
ascertain whether the respondent's unlawful conduct manifests
an attitude of opposition to the purposes of the Act to protect the
rights of employees generally. See also *Federated Logistics &
Operations*, 340 NLRB 255, 258 fn. 9 (2003).  Both prongs of
this standard are met here. First, as stated, the Respondent has
demonstrated a proclivity to violate the Act, and most of the vi-
olations were committed by the owners and top managers of the
Respondent. *Sysco Grand Rapids*, LLC, 367 NLRB No. 111, slip
op. at 1–2 (2019) (broad cease-and-desist order warranted in part
based on fact that much of the misconduct was perpetrated by
high-level management officials, including the respondent's
president).  Moreover, the serious unfair labor practices found in
this case, in combination with the numerous violations addressed
in the prior formal settlement,  demonstrate a general disregard
for employees' fundamental Section 7 rights.  For these reasons,
a broad cease-and-desist remedy is warranted and will best ef-
fectuate the remedial purposes of the Act.[36]

   On these findings of fact and conclusions of law, I issue the
following recommended

ORDER[37]

   Having found Respondent, Amerinox Processing, Inc., has en-
gaged in certain unfair labor practices, I find that it, through its
officers, agents, successors, and assigns, shall

   1. Cease and desist from:

   (a)  Discharging, laying off, or otherwise discriminating
against employees because of  their support for a union or be-
cause other employees support a union.

   (b)  Creating the impression that it is engaged in surveillance
of its employees' union or other organizational activities.

   (c)  Threatening employees with discharge or other retaliation
if you choose to be represented by or support a union.

   (d)  Prohibiting employees  from discussing a union during
working time while permitting them to discuss other subjects un-
related to work.

   (e)  Telling employees they are being separated because of
their support for a union.

   (f)  Maintaining work rules that prohibit employees from dis-
cussing their wages, benefits, or other terms or conditions of em-
ployment.

   (g)  In any other manner interfering with, restraining, or co-
ercing employees in the exercise of the rights guaranteed them
by Section 7 of the Act.

   2. Take the following affirmative action necessary to effectu-
ate the policies of the Act.

   (a)  Within 14 days from the date of this Order, offer full re-
instatement to Miguel Gonzalez, Andrew Rodriguez, Joseph
Soto, Keon Smith, and Bernard Venable,  their former jobs or, if
those jobs no longer exist, to substantially equivalent positions,
without prejudice to their seniority or any other rights or privi-
leges previously enjoyed.

   (b)  Make Kyle George, Miguel Gonzalez, Andrew Rodri-
guez, Joseph Soto, Keon Smith, and Bernard Venable whole for
any loss of earnings and other benefits suffered because of the
discrimination against them, in the manner set forth in the Rem-
edy section of this Decision.

   (c)  Compensate Kyle George, Miguel Gonzalez, Andrew Ro-
driguez, Joseph Soto, Keon Smith, and Bernard Venable them
for the adverse tax consequences, if any, of receiving a lump-
sum backpay award, and file with the Regional Director for Re-
gion 4, within 21 days of the date the amount of backpay is fixed,
either by agreement or Board order, a report allocating the back-
pay award to the appropriate calendar years for each of them.
File with the Regional Director for Region 4 a copy of each af-
fected employee's corresponding W-2 form(s) reflecting his
backpay award.

   (d)  Within 14 days from the date of this Order, remove from
its files any references to the unlawful separation of Kyle
George, the unlawful termination of Miguel Gonzalez and un-
lawful layoffs of Andrew Rodriguez, Joseph Soto, Keon Smith,
and Bernard Venable, and within 3 days thereafter notify them

---

[35] The Acting General Counsel argues Notice mailing is appropriate
because of Respondent's persistent goal of undermining the Union, the
length of time that has passed since the events of this case and the six
employees' absence from work during that time warrant the remedy.  I
find these issues are adequately addressed with the posting and reading
of the Notice.  Plus, the Order provides for reinstatement of five of the
six discriminatees, who will be present and visible to employees.

[36] The Acting General Counsel also seeks a remedial order providing
the Union with the employees' contact information, access to Respond-
ent's bulletin board, reasonable access to Respondent's facility during
non-work time, notice and equal time for the Union to respond to any
points made by the Respondent to employees on the question of union

representation, and the right to deliver a 30-minute speech to employees
on working time prior to any Board election.  The reason given is the
Union's need to have access to employees, free from interference and
surveillance.  The Union, however, does not lack the ability to access to
Respondent's employees. Gadsby was able to communicate with several
employees with the information he had, and the discriminatees, once re-
instated, will be able to communicate with coworkers.  I, therefore, see
no need for these additional remedies under the circumstances.

[37] If no exceptions are filed as provided by Sec. 102.46 of the Board's
Rules and Regulations, the findings, conclusions, and recommended Or-
der shall, as provided in Sec. 102.48 of the Rules, be adopted by the
Board and all objections to them shall be deemed waived for all purposes.

AMERINOX PROCESSING, INC.    25

in writing that this has been done and that the discharge or layoff will not be used against them in any way.

(e)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, Social Security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of back pay due under the terms of this Order.

(f)  Within 14 days after service by the Region, post at its Camden, New Jersey facility, copies of the attached notice marked "Appendix A."[38]  Copies of the notice, on forms provided by the Regional Director for Region 4, after being signed by Respondent's authorized representative, shall be posted by Respondent immediately upon receipt and maintained for 60 consecutive days in conspicuous places including all places where notices to members are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if Respondent customarily communicates with its members by such means. If the facility is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facility is closed due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work, and the notices may not be posted until a substantial complement of employees have returned to work. Any delay in the physical posting of paper notices also applies to the electronic distribution of the notice if Respondent customarily communicates with its employees by electronic means. Reasonable steps shall be taken to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facilities involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice and explanation of rights to all current employees and former employees employed by the Respondent at its Camden, New Jersey facility at any time since June 1, 2020.

(g)  Hold a mandatory employee meeting, or meetings, on working time and at times when the Respondent customarily holds meetings, to ensure the widest possible employee attendance, at which the Respondent's representative(s) read aloud the Notice to employees in English and Spanish, in the presence of a Board Agent, via ZOOM/video conference, or in a manner and location otherwise ordered by the Regional Director of Region 4, or at the Respondent's option, have a Board agent read aloud the Notice via ZOOM/video conference or in a manner and location otherwise ordered by the Regional Director of Region 4 in the presence of a responsible Respondent official.

(h)  Within 21 days after service by the Region, file with the Regional Director for Region 4 a sworn certification of a responsible official on a form provided by the Region attesting to the

steps that the Respondent has taken to comply.

Dated, Washington, D.C., July 8, 2021.

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT interfere with, restrain, or coerce you in the exercise of the above rights in any manner.

WE WILL NOT threaten you with discharge or other retaliation if you choose to be represented by or support a union.

WE WILL NOT create the impression that we are watching your union or other organizational activity.

WE WILL NOT prohibit you from discussing a union during working time while permitting you to discuss other subjects unrelated to work.

WE WILL NOT tell you that you are being separated because of your support for a union.

WE WILL NOT discharge you, lay you off, or otherwise discriminate against you in any way because you support a union or because other employees support a union.

WE WILL NOT maintain work rules that prohibit you from discussing salary or wage information, hours, or other terms or conditions of employment.

WE WILL offer Miguel Gonzalez, Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable their jobs back, or if those jobs no longer exist, to substantially equivalent positions, along with their seniority and all other rights or privileges.

WE WILL pay Miguel Gonzalez, Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable and for the wages and other benefits they lost because we discharged them or laid them off.

WE WILL pay Kyle George for the wages and other benefits he lost during the two weeks he would have worked had we not accepted his resignation immediately.

WE WILL compensate Miguel Gonzalez, Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable for their search-for-work and interim employment expenses regardless of whether those expenses exceed their interim earnings, and for adverse tax consequences, if any, of receiving a lump-sum back-pay award.

United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

---

[38]  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the

26                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

WE WILL file with the Regional Director for Region 4, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year, as well as a copy of each backpay recipient's corresponding W-2 form(s) reflecting the backpay award.

WE WILL remove from its files any reference to the unlawful separation of Kyle George, discharge of Miguel Gonzalez, and layoff of Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable, and within 3 days thereafter, notify them in writing that this has been done and that the unlawful employment actions will not be used against them in any way.

WE WILL submit a W-2 and a report allocating the wage award to the appropriate calendar years Kyle George, Miguel Gonzalez, Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable

WE WILL, to the extent we have not already done so, rescind Section L (Performance, Behavior Expectations and Discipline) of its Employee Manual, Section V (Confidential Information/Non- Disclosure) of its Employee Manual, and Section C (Major Infractions) of its Progressive Disciplinary Policy that require you to keep wages, benefits, and other terms and conditions of employment confidential.

WE WILL, to the extent we have not already done so, furnish you with inserts for the current Employee Manual and current Progressive Disciplinary Policy that (1) advises that the unlawful provisions have been rescinded, or (2) provides a lawfully worded provision on adhesive backing that will cover the unlawful provisions; or publish and distribute to you a revised Employee Manual and revised Progressive Disciplinary Policy that (1) do not contain the unlawful provisions, or (2) provide lawfully worded provisions.

<div align="center">AMERINOX PROCESSING, INC.</div>

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/04-CA-268380 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, a true and correct copy of the foregoing

Underlying Decision From Which Its Petition Arises was served via the Court's

CM/ECF system on the following:

<div align="center">

Ruth E. Burdick
Usha Dheenan
Barbara Sheehy
Deputy Associate General Counsel
Appellate and Supreme Court Litigation Branch
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570-0001
Ruth.Burdick@nlrb.gov
Usha.Dheenan@nlrb.gov
Barbara.Sheehy@nlrb.gov

</div>

DATED: July 25, 2022                    */s/ Daniel V. Johns*
                                         Daniel V. Johns

LEGAL\58503159\1